2022 IL App (2d) 210545-U
No. 2-21-0545
Order filed February 1, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* J.A., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No.   19-JA-138 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. Joe A., Respondent- Appellant). | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's fitness and best-interest findings were not contrary to the manifest weight of the evidence.  Affirmed.

¶ 2    Respondent, Joe A., appeals from the trial court's orders finding him unfit to parent his son, J.A., and terminating his parental rights.  We affirm.

¶ 3                                 I. BACKGROUND

¶ 4    J.A. was born on April 2, 2019, and, shortly thereafter, DCFS took him into protective custody at the hospital.  Specifically, on April 5, 2019, DCFS filed a neglect petition, alleging that J.A. was neglected because he was in an injurious environment, as his mother, Kelli C., had struck

his sibling, DCFS had removed that sibling from the home, and where Kelli had not cured the conditions that led to the sibling's removal.

¶ 5    On April 18, 2019, respondent waived a shelter care hearing. Respondent signed an acknowledgement of paternity; thus, the court commented that no DNA test was needed.  On August 16, 2021, the court adjudicated J.A. abused and neglected.

¶ 6    According to service plans in the record, on February 22, 2019 (*i.e.*, before J.A. was born), respondent was interviewed by a DCFS integrated-assessment screening team.  Respondent was informed of his right to review a copy of his portion of the report and that the completed integrated assessment report would become part of the case file, would be used in service planning, and would be presented to the court. According to the report, respondent "was guarded and irritable throughout the interview.  He did not want to answer questions about his family and provided limited information ***.  It was also noted that [respondent] had a strong odor of alcohol and may have been under the influence during the assessment."  In addition, according to the record, hospital staff later reported that respondent was intoxicated (alcohol) at the time of J.A.'s delivery. The integrated assessment recommended that, in addition to visitation, respondent engage in substance abuse services, complete a mental health assessment, and, due to a 2016 domestic violence conviction, attend domestic violence classes.

¶ 7    On November 18, 2019, the court held a dispositional hearing.  Respondent testified that, through his parole program, he was attending a 26-week domestic violence course and, although he had been discharged for a period, he had re-engaged and had 3 weeks remaining.  Respondent also testified that, in June 2019, he had completed substance abuse treatment.  He acknowledged, however, that he had two positive drug tests for cocaine on October 25, and November 1, 2019, but he argued that the findings were incorrect and resulted from a medication he was taking that

contained codeine. Respondent testified that he had voluntarily enrolled in anger management classes. He had completed the required mental health assessment, but no mental health services were recommended. Respondent testified that, until August 2019, he had been visiting J.A. regularly, but J.A.'s placement was then moved to a location around one hour away, and, since then, respondent saw J.A. less frequently. Respondent agreed that he was living with his mother and remained on parole for his domestic violence conviction. He testified that he has no other criminal history; however, the record also reflects that he self-reported to having been previously incarcerated in Iowa for robbery/theft and arrested in Minnesota for domestic violence.

¶ 8    The State argued that the court should find respondent unfit, unwilling, and unable to care for J.A. The State noted that respondent had *three* positive cocaine drops after completing substance abuse counseling and disputed respondent's assertion that the positive drops resulted from medication, as codeine would register in testing as an opiate, not as cocaine. The State also noted a report that respondent was dropped from his domestic violence counseling on account of the positive drug drops and, as he had missed 8 out of 26 classes, he might have to start over if allowed to re-enroll.

¶ 9    The court rejected respondent's claim that his positive cocaine drug tests could have been caused by a medication containing codeine, noting:

> "[As to respondent,] to brush up a bit on his science, it is scientifically impossible to take codeine and test positive for cocaine, so if there is some sort of false positive, the burden is on [respondent] to demonstrate that, and it has not been demonstrated. These tests are presumptively positive—or presumptively accurate I should say, and the court has no reason to doubt them, so there is unfitness, unwillingness."

The court found respondent unfit, unwilling, and unable to care for J.A.[1]

¶ 10     At a permanency review hearing on July 15, 2020, the court found that respondent had not made reasonable efforts and that caseworkers were having trouble maintaining communication with him.

¶ 11     At a January 7, 2021, permanency review hearing, it was reported that respondent had "fallen off the radar." Respondent's counsel asked for a continuance because respondent had not appeared at the hearing, she had not been in contact with respondent for "quite some time," and respondent had not reached out to her. Further, counsel summarized the recent DCFS reports as showing: "[respondent is] not engaged in services, he's not returning phone calls to the caseworker. He's not participating in court, Your Honor. He was not at the last court appearance either. He's not regularly visiting ***." The court denied the continuance and found that respondent had not made reasonable efforts or progress. The court also found that respondent "is certainly not participating in any aspect of this case for reunification." The court changed the goal to substitute care pending termination of parental rights.

¶ 12     It was later discovered that respondent had been incarcerated since October 5, 2020.

¶ 13     On March 8, 2021, the State filed a petition to terminate respondent's parental rights, asserting that he was unfit because he failed to: (1) maintain a reasonable degree of interest, concern, or responsibility as to J.A.'s welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) protect J.A.

---

[1] We note that the court next addressed two orders of protection filed by respondent and Kelli against the father of one of Kelli's other children. Not only did the court deny the petitions, but it also found respondent and Kelli in direct criminal contempt for filing false pleadings and sentenced them to 10 days' confinement with credit for 5 days already served.

from an injurious environment (*Id.* § l(D)(g)); (3) make reasonable efforts toward the return of J.A. to him during a nine-month period after the adjudication of neglect, specifically, for the periods August 16, 2019, to May 15, 2020, and April 8, 2020, to January 7, 2021 (*Id.* § 1(D)(m)(i)); and (4) make reasonable progress toward the return of J.A. to him during a nine-month period after an adjudication of neglect, specifically, for the periods August 16, 2019, to May 15, 2020, and April 8, 2020, to January 7, 2021 (*Id.* §1(D)(m)(ii)).

¶ 14                                    A. Fitness Hearing

¶ 15    On May 7, 2021, the fitness hearing commenced.  As respondent remained incarcerated, the court limited the scope of the hearing to concern only the petition to terminate as it related to Kelli.  At the conclusion of the hearing, the State offered 11 documents, including integrated assessments and service plans, for admission into evidence; the documents also contained information pertaining to respondent and his recommended services and progress.  Respondent's counsel stipulated to foundation and represented that she had no objection their admission.

¶ 16    On June 17, 2021, and July 14, 2021, the fitness hearing continued, with respondent present (first via Zoom from Big Muddy River Correctional Center and, then, in person).  Respondent testified that he was 59 years old and J.A.'s father.  He agreed that, on January 9, 2019, the night Kelli struck J.A.'s brother (which led to his removal and, later, J.A.'s removal), he was present at Kelli's home.  Respondent was then arrested because, due to his 2016 conviction for domestic battery to Kelli, his presence there constituted trespass.  Respondent testified that, other than his 2016 domestic violence conviction against Kelli, he has no other criminal convictions, clarifying that he was once arrested for domestic violence in Minnesota, but the charges were dismissed. Respondent conceded that, since October 5, 2020, he had been incarcerated for a parole violation, based on a June 2020 domestic violence incident involving Kelli.  Respondent testified that, until

his October 2020 arrest, he was compliant with parole. Further, he testified that he had completed substance abuse treatment in June 2019, completed a mental health assessment, but was not required to engage in mental health services, and participated in a partner abuse intervention program, as well as anger management classes. Respondent agreed that, as a condition of his parole, he was required to complete drug drops.

¶ 17    Respondent testified that, after his incarceration in October 2020, he received only two calls from the caseworker, Jaimi Kitchen. In those calls, he asked how J.A. was doing and how to enroll in counseling to get J.A. back. According to respondent, while the prison does have an anger management program, it was not available for a period due to the Covid-19 pandemic; while it had recently resumed, he could not participate because he was due to be released in one week (June 23, 2021). Respondent testified that, upon his release, he will be discharged from parole and will not have any services or requirements remaining as a condition of parole.

¶ 18    Respondent explained that, when J.A. was initially removed, he was placed with respondent's aunt in Rockford; respondent did not miss any visits with J.A. while he was placed there. Later, however, J.A. was removed and placed with Kelli's mom, Karen C., who lives around 1.5 to 2 hours away from respondent. According to respondent, his aunt informed him about the change in placement after it occurred. Initially, DCFS brought J.A. to Rockford for visits, and respondent was able to visit him, but respondent did not have a way to travel to see J.A. at Karen's house. Further, since his incarceration, DCFS had not arranged for him to have any video visits or contact with J.A.

¶ 19    DCFS caseworker Kitchen testified that respondent is J.A.'s putative father, but, despite paternity testing being repeatedly scheduled, respondent never completed a test. Kitchen claimed that it was questionable whether respondent was, in fact, J.A.'s biological father, but conceded that

he is listed as the father on J.A.'s birth certificate, he acknowledged paternity, has participated in these proceedings, and no other person has been identified or has stepped forward as a possible father. Kitchen testified that, although respondent's integrated assessment and service plans recommended that he complete domestic violence services, substance abuse services, a mental health assessment, individual counseling, and parenting classes, he had not successfully completed any services. (Kitchen noted that his conditions of parole also required him to undergo substance abuse and domestic violence services). Specifically, although, in 2019, respondent successfully completed substance abuse services, he later had positive drops and/or failed to appear for several drops. Accordingly, respondent was asked to complete an updated substance abuse assessment, but he did not do so. In terms of domestic abuse services, Kitchen testified that respondent attended a program on three occasions and was unsuccessfully discharged each time, most recently in December 2020, due to attendance issues. According to Kitchen, on numerous occasions, she explained to respondent the continued concerns about domestic violence and substance abuse, the reasons for DCFS's service recommendations, as well as where to go for services. She testified that respondent had acknowledged that domestic violence has been a problem for him and that he appeared "cooperative and willing to engage in services." However, although "he agreed to services," he did not attend.

¶ 20 Kitchen testified that she believed respondent's recent incarceration resulted from a new offense, as opposed to a parole violation; namely, according to the police report, respondent came to Kelli's home intoxicated, battered her, and then a warrant was issued for trespassing and domestic battery. Kitchen could not recall if respondent had completed anger management counseling, but she reported that, during her conversations with him, respondent would "often get upset, argumentative, talk over people, get very agitated, and it really made conversation difficult

to be productive having to end meetings not really going anywhere." She found him uncommunicative, often not returning her calls, although she agreed that he was more cooperative in one of their telephone meetings than he had been in person. Respondent engaged in visitation, but was not consistent, sometimes leaving the visit early, showing up late, missing a visit, or claiming he did not feel well, but never providing doctor's notes or reasons for other absences. All visits were supervised, and, due to his lack of engagement in services, he never moved to unsupervised visits. There were some concerns expressed by Karen, the foster mother, that he did not adequately change diapers or feed J.A. snacks during their one-hour visits. Respondent's last visit was in August 2020. Kitchen testified that respondent then stopped appearing for visits, so they were cancelled. As part of her job, she made monthly efforts to find respondent and learned in January 2021 that he was incarcerated. Due to the pandemic, visits were not arranged while he was incarcerated. Respondent did not write or call to let DCFS know that he was in prison.

¶ 21    Because J.A. was removed upon birth, due to his sibling's case, respondent has never had J.A. in his care. Kitchen acknowledged that respondent would occasionally ask for updates on J.A.'s welfare. According to Kitchen, DCFS did not feel it was suitable to allow respondent to take guardianship or custody of J.A., as concerns remained over ongoing domestic violence, his substance abuse history, and his lack of engagement in recommended services.

¶ 22    Respondent's testimony resumed, and he testified that the charges pertaining to his October 2020 arrest had been dismissed. He further explained that, since he has now been discharged from parole, the services that parole required of him (domestic violence, substance abuse, drug drops, and anger management) were no longer required. Respondent testified that Kitchen's testimony was the first time he had heard concerns that he did not properly change or feed J.A. during their one-hour visits. As for why he did not visit J.A. between August 2020 and his October 2020

incarceration, respondent blamed the pandemic. Respondent testified that he asked Kitchen about J.A.'s welfare and what he could do upon his release to continue to be in J.A.'s life. When asked about numerous missed drug drops, respondent replied, "It is what it is. I had a few dirty drops; so, yeah, it backed me up some. But I still went forward back to getting to my classes though." He agreed that he maxed out of parole, as opposed to successfully completing it. Respondent also acknowledged that he was previously convicted of a felony in Iowa and was arrested for domestic violence in Minnesota.

¶ 23    On August 9, 2021, the court found respondent unfit on all four bases alleged in the State's petition. In sum, the court noted that respondent had completed no services, was discharged from services on more than one occasion, visitation with J.A. was sporadic, and respondent never moved to unsupervised visitation.

¶ 24                          B. Best-Interests Hearing

¶ 25    On September 8, 2021, the case proceeded to a best-interests hearing. The State called Kitchen as its only witness. She testified that J.A., age 2½, is "very bonded" with his maternal grandmother, Karen, with whom he has been placed since September 2019. A maternal uncle also lives in the home, and J.A. "adores" him, too. Karen ensures that J.A. has contact with his extended family, including his two siblings, and she provides his necessities. Karen is approximately in her 60's; she has a strong community support system of extended family and friends in her area. As J.A. has a speech delay, Karen ensures that he attends three or four weekly appointments to address those needs. He recently started therapy through Easter Seals. According to Kitchen, J.A. was diagnosed with an extra chromosome, and doctors are still assessing how that might impact him long term. Karen was willing to provide permanency for J.A. through adoption. Kitchen agreed that Karen lives in Alsip, around 1.5 hours away from respondent, and that Karen's relationship

with respondent is minimal and contentious. However, Karen had expressed that, if respondent were to be in a healthy and stable situation, she would desire that J.A. have a relationship with him; yet, she also understood the need to protect J.A. and, if it is not safe, she would not encourage the relationship. Kitchen agreed that she had not witnessed visits between respondent and J.A. Kitchen testified that J.A. has been in DCFS's care his entire life and, for two years, respondent has failed to engage or make progress in the recommended services; therefore, she believed it was in J.A.'s best interests to terminate respondent's parental rights and obtain permanency through adoption.

¶ 26    Kelli testified that she has observed some of respondent's visits and he was nurturing and loving toward J.A. She testified that J.A. was bonded to respondent and looked to him for comfort and cuddling. In addition, Kelli testified that Karen is mentally unstable and made her leave home at age 14 or 15.

¶ 27    Respondent testified that, during visitation, J.A. recognizes him and smiles, comes straight to him, and holds out his arms and hugs him. He finds J.A. comforting. They play with toys. Respondent testified that he feels there is a bond between them. Respondent testified that he thinks Karen has mental health issues, although he has never met her. Further, respondent testified that he lives with his mother in a stable residence and could financially provide for J.A. through his social security income. Respondent testified that he could parent J.A. all day and that he also has family in Rockford that could provide support.

¶ 28    In rebuttal, Kitchen testified that background checks were performed on Karen (and J.A.'s uncle in the household) prior to placing him there. Nothing in the background checks revealed anything that gave DCFS concerns about J.A.'s safety in the home.

¶ 29    The court found that it was in J.A.'s best interests to terminate respondent's parental rights. It found "very dim" the prospects of J.A.'s reunification with either parent. The court noted that respondent had been given ample opportunity to complete services, but had not, and the record did not contain evidence suggesting that respondent would, within a reasonable time, complete or progress in necessary services to reunite with J.A. Overall, this failure would be contrary to J.A.'s overriding best interest, which is permanency. In contrast, J.A. was currently living in a household where he was supported and bonded with his grandmother. Karen is J.A.'s home and family. The court found that, in addition to their bond, Karen protects J.A and meets his physical and emotional needs. Finally, the court noted that it took Kelli's and respondent's testimonies "with something of a grain of salt," as many of their accusations were not corroborated in the record and where respondent had never even met Karen. Respondent appeals.

¶ 30                                              II. ANALYSIS

¶ 31    Respondent argues on appeal that the trial court erred in determining that he is an unfit parent and that it is in J.A.'s best interests for respondent's parental rights to be terminated.

¶ 32    Proceedings to terminate parental rights are governed principally by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) (Act) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)). The Act provides a two-step process for the involuntary termination of parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must prove that the parent is unfit by clear and convincing evidence. *Id.* Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) lists the grounds under which a parent can be found unfit. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Second, if the court makes a finding of unfitness, the court then considers whether it is in the best interests of the minor to terminate parental rights. *Deandre D.*,

405 Ill. App. 3d at 953. The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interests. *Id.*

¶ 33                                 A. Unfitness

¶ 34    We address first respondent's arguments concerning the court's finding of unfitness. As to count I, failure to maintain a reasonable degree of interest, concern, or responsibility (750 ILCS 50/1(D)(b) (West 2018)), respondent argues that, except for his period of incarceration, and subject to limitations created by the pandemic and J.A.'s distant placement, he consistently showed reasonable interest, concern, and responsibility for J.A.'s welfare. He notes that he completed an integrated assessment in February 2019, was successfully discharged from substance abuse treatment on June 19, 2019, completed a mental health assessment on June 24, 2019, voluntarily took anger management classes through October 2020, and signed all consents and releases requested of him. Although he missed drug drops, "there was no evidence that [respondent] had a substance abuse problem or had been diagnosed with any such disorder." Further, he argues that he regularly attended visits until J.A. was moved to Karen's home, around 1.5 hours away, and that he could not participate in visitation or services while incarcerated from October 2020 to January 2021, in part due to the limitations placed on both because of the pandemic. Finally, respondent asserts that DCFS never articulated, nor did the State produce evidence at trial, that respondent needed substance abuse counseling, parenting classes, or individual counseling. Respondent notes that, while a failure to complete services may be grounds to find a lack of reasonable interest, concern, or responsibility, the services must be necessary and, here, the State did not produce evidence that they were, as respondent did not have anything to do with the reason J.A. was removed and placed in DCFS's care. Nevertheless, even though he should not have been

required to do so, he engaged in those services. In sum, he argues that he consistently demonstrated a pattern of interest, concern, and responsibility for J.A.

¶ 35    With respect to count II, failure to protect from an injurious environment (750 ILCS 50/1D(g) (West 2018)), respondent argues that the court erred because J.A. was taken into custody at the hospital, never lived with respondent or was ever in his care, and, thus, was never in an environment from which respondent could fail to protect him.

¶ 36    As to counts III, failure to make reasonable efforts (750 ILCS 50/1(D)(m)(i) (West 2018)), and IV, failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2018)), respondent incorporates his arguments relative to count I and argues, collectively, that the State did not meet its burden on either count because it never established that the services he failed to complete were necessary. He concedes that the record sufficiently established a need for domestic violence services, but notes that he engaged in those services. "While attendance issues may have prevented him from fully completing those classes, his repeated re-engagement, when possible (apart from incarceration and COVID), showed his commitment to dealing with the issue." In his reply brief, respondent emphasizes that, with respect to counts III and IV, his "argument is not that his efforts or progress were reasonable, [but] it is that [the services] should never have been required of him."

¶ 37    We will reverse a finding of unfitness only where it is against the manifest weight of the evidence, that is, where the determination is unreasonable. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). With respect to count II, we agree with respondent that the court's unfitness finding based upon respondent's failure to protect J.A. from injurious conditions within his environment was against the manifest weight of the evidence. Indeed, the evidence demonstrated that J.A. was never in respondent's care or in an environment where respondent could attempt to protect him. See, *e.g.*, *In re C.W.*, 199 Ill. 2d 198, 212 (2002) ("where a child has been removed from an injurious

home environment and placed in foster care, a parent cannot be found unfit based on a 'failure to protect' during the period the child is in foster care"). The trial court here recognized this, where it found that the State did not meet its burden on this count with respect to the petition to terminate Kelli's rights. In fact, given the court's ruling on this count with respect to Kelli, it is likely that its finding of unfitness on this count with respect to respondent was simply a mistake. Indeed, the State concedes that it did not meet its burden of proving unfitness on this count. As such, we vacate the court's unfitness finding that was based on count II of the petition to terminate.

¶ 38     This does not, however, end our inquiry. The grounds for finding unfitness under the Adoption Act are independent, and we may affirm the trial court's judgment if the evidence supports any one of the grounds alleged. See 750 ILCS 50/1(D)(m) (West 2018); see also *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30. We conclude that, at a minimum, the court's finding that respondent was unfit for failing to make reasonable progress toward the return of J.A. to him during a nine-month period after an adjudication of neglect, specifically, from April 8, 2020, to January 7, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2018)) was not against the manifest weight of the evidence.

¶ 39     Again, respondent asserts that the State failed to meet its burden on this count because his failure to make progress was predicated on his lack of engagement or completion of recommended services, but the State presented no evidence that those services were necessary. This argument is raised far too late. Indeed, the record does not reflect that respondent ever disagreed with or challenged the necessity of the recommended services before DCFS or the trial court. Even setting aside that some of the services were required as a condition of his parole, limiting his ability to challenge their necessity, according to Kitchen, respondent *agreed* to participate in the services recommended in the integrated assessment and service plans. Respondent did not testify to the

contrary. Nor did he argue before the trial court that the services were unnecessary, which alone is sufficient to find this argument forfeited. See, *e.g.*, *In re H.D.*, 343 Ill. App. 3d 483, 489 (2003).

¶ 40 Moreover, even if respondent did not agree with the services, he failed to participate in the administrative process for appealing or challenging those services. See 89 Ill. Admin. Code § 337.70(a)(8) (West 2018) (families and children may appeal "the imposition of unnecessary services or conditions as part of a service plan"). Also, although not signed, the record reflects that the service plans in this case contain the following language:

> "I have received a copy of the service plan and the plan has been explained to me. I know I can disagree with any part of this plan and have my disagreement recorded. My written Statement of Disagreement will be attached and, therefore, will become a part of the Service Plan. I know I can request a review and appeal of this plan or any part of it by completing the appropriate forms. I have received a statement of my service appeal rights. I understand that if I don't respond within forty-five (45) days I waive my rights to an appeal."

Further, within the plan, with respect to respondent's recommended service goals, there exists language that respondent:

> "agrees to participate and fully engage with all services requested by DCFS, the court, and service providers unless, through appeal, services are deemed not required until successfully discharged. Service Appeals can be made in writing to: Administrative hearings Unit DCFS, 406 E. Monroe St, Station 15, Springfield, IL 62701."

¶ 41 Respondent does not allege, nor does the record show, that he ever took any step to challenge or appeal the recommended services as being unnecessary. As such, respondent's attempt now to challenge the necessity of the recommended services is forfeited.

¶ 42 In any event, respondent concedes that the recommendation for domestic violence counseling finds support in the record. Thus, even if we consider only that recommendation, respondent did not complete those courses and was dropped from his class. While he asserts that he demonstrated a commitment to addressing that issue by re-engaging and attending when he could (apart from incarceration and the pandemic), respondent's "commitment" alone does not equate to demonstrable progress. Specifically, reasonable progress is an objective standard that requires at a minimum, "measurable or demonstrable movement" toward reunification. *In re Daphnie E.*, 368 Ill. App. 3d 1053, 1067 (2006). Respondent objectively did not progress in his domestic violence counseling where he never completed the courses. Moreover, to the extent that respondent contends that he could not be faulted for failing to complete services while incarcerated, we would note that incarceration does not act to toll the nine-month period that measures whether reasonable progress toward reunification has been made. See, *e.g.*, *In re J.L.*, 236 Ill. 2d 329, 343 (2010). Finally, to the extent that respondent contends that his domestic violence issues were not even the reason that J.A. was initially removed and brought into care, this argument fails, as conditions rendering inappropriate a return to a parent's care, even if they were not those that originally led to removal, may sustain the court's finding. See, *e.g.*, *In re D.D.*, 309 Ill. App. 3d 581, 586 (2000) (aff'd, 196 Ill. 2d 405 (2001)) (in determining whether parent has made reasonable progress toward minor's return home, the court is not limited to considering only original basis for removal and may consider other conditions subsequently discovered that could inhibit the child's return to the parent).

¶ 43 We conclude that the court's finding that the evidence reflects that respondent failed to make reasonable progress toward the return of J.A. to him, at a minimum, from April 8, 2020, to January 7, 2021, was not against the manifest weight of the evidence. Respondent did not have

any visitation with J.A. after August 2020, *i.e.*, for five of the nine months at issue, nor did he ever move to unsupervised visitation. In October 2020, respondent was arrested for violating his parole, and he remained incarcerated through January 2021. During that period, he engaged in no services, nor were any recommended services successfully completed. Further, in the relevant nine-month period, respondent missed five drug drops (four before he was incarcerated); accordingly, all missed drops were deemed positive.[2] Again, reasonable progress requires measurable or demonstrable movement toward reunification. See *Daphnie E.*, 368 Ill. App. 3d at 1067. Here, the evidence demonstrated virtually *no* movement or progress between April 2020 and January 2021, and the court's finding of unfitness was not against the manifest weight of the evidence.

¶ 44    In sum, as we may affirm the unfitness finding if the evidence supports any one of the grounds alleged (*B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30), the trial court did not err in finding respondent unfit.

¶ 45                                B. Best Interest

¶ 46    Next, we reject respondent's argument that the State failed to prove that it was in J.A.'s best interests to terminate his parental rights. Respondent argues that the evidence demonstrated that, except for his period of incarceration, he regularly visited with J.A., that J.A. came straight to him during visits and hugged him, that they played together, and that they comforted each other. He notes that Kelli testified to having observed respondent with J.A. and that respondent was nurturing, J.A. looked to him for comfort, and they were bonded to each other. Further, he points

---

[2] We note that we do not find compelling the State's emphasis that respondent did not complete a paternity test, given that he acknowledged paternity, and the court stated that testing was unnecessary.

to Kelli's testimony that Karen made her leave home at a young age. He argues that his engagement in services demonstrates his motivation to reunite with J.A., and he notes that there is no evidence that he has a substance abuse disorder, mental illness, lack of parenting skills, or other issues that would prevent placing J.A. in his care. We disagree.

¶ 47    At the best-interests stage, the court "focuses upon the child's welfare and whether termination would improve the child's future financial, social[,] and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). "[A]t a best[-]interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The court must consider the following factors in making a best-interests determination: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and security; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). We will reverse a best-interest finding only where it is against the manifest weight of the evidence. See *N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 48    Here, despite respondent's interest in reunification, J.A. has never been in respondent's care, even for unsupervised visits. As previously discussed, while respondent engaged in some services, he never completed any, and, given his domestic violence history, the failure to complete the domestic violence counseling is particularly relevant to considering the safety of any home environment respondent might be able to offer. We do not necessarily subscribe to the State's

concern over respondent's age (indeed, Karen is even older than respondent). However, as the court noted, the record reflects that J.A. had been placed with Karen for most of his life. They are bonded, she is his family, and he looks to her for comfort. Not only has Karen met J.A.'s basic needs, but he has special needs, and she has been taking him to his therapies and weekly appointments to address them. Karen has also worked to preserve J.A.'s sibling relationships and is willing to provide permanency through adoption.

¶ 49    In sum, when weighing J.A.'s best interests, the trial court properly considered the relevant factors, including that of permanency, and the record supports its findings. Thus, we cannot conclude that the trial court erred in determining that termination of respondent's parental rights is in J.A.'s best interest.

¶ 50                                    III. CONCLUSION

¶ 51    For the reasons stated, we vacate the court's finding of unfitness based on count II of the State's petition to terminate respondent's parental rights (failure to protect from an injurious environment (750 ILCS 50/1D(g) (West 2018)). In all other respects, the judgment of the circuit court of Winnebago County is affirmed.

¶ 52    Affirmed; vacated in part.