NOTICE
Decision filed 11/14/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220412-U

NOS. 5-22-0412, 5-22-0413 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* FORREST F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-11 |
| | ) | |
| Sandra F. and Frank F., | ) | Honorable |
| | ) | Brett N. Olmstead, |
| Respondents-Appellants). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the circuit court's judgment terminating the respondents' parental rights where the circuit court's findings that the respondents were unfit persons, and that termination of their parental rights was in the minor child's best interests, were not contrary to the manifest weight of the evidence.

¶ 2   The respondents, Sandra F. and Frank F., are the parents of Forrest F. (minor child), born on December 28, 2016. On June 9, 2022, the circuit court entered a judgment terminating the respondents' parental rights based on its findings that the respondents were unfit persons, and that termination of the respondents' parental rights was in the best interest of the minor child. For the reasons that follow, we affirm the judgment of the circuit court.

1

¶ 3                                    I. BACKGROUND

¶ 4       On November 6, 2017, the respondents appeared in the circuit court in an attempt to obtain emergency orders of protection against each other. Each respondent alleged that the other had abused the minor child in some manner, and Frank further alleged that Sandra was smoking "weed" and drinking alcohol daily. The circuit court denied both requests and instead, directed the reporter to make a hotline report to the Illinois Department of Children and Family Services (DCFS), based upon the allegations contained in the requests for orders of protection.

¶ 5       The next day, DCFS attempted to locate the respondents and the minor child but was unable to do so. DCFS was finally able to meet with Frank on November 20, 2017, and Frank informed DCFS that Sandra and the minor child had left the home on November 3, 2017. DCFS was unable to locate Sandra and the minor child until January 8, 2018. After locating Sandra, DFCS met with Sandra, Frank, and Sandra's mother. At that meeting, an out-of-home safety plan was enacted, and the minor child was placed in the care of Sandra's mother, with the respondents having daily, supervised visitation. The out-of-home safety plan also required that Sandra complete a drug and alcohol screening.

¶ 6       On January 10, 2018, Sandra completed the drug and alcohol screening, which was negative for alcohol, but positive for tetrahydrocannabinol (THC), an active ingredient in marijuana. As such, DCFS took protective custody of the minor child on January 24, 2018.

¶ 7       On January 25, 2018, the State filed a petition for adjudication of neglect pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). The State's petition for adjudication of neglect alleged that the minor child was neglected as defined in section 2-3(1)(b) of the Act because the minor child was in an environment that was injurious to his welfare due to (1) the respondents failing to correct the conditions which resulted in a prior adjudication of

parental unfitness to exercise guardianship and custody of the minor child's sibling, Angelia F.; (2) the environment exposed the minor child to domestic violence; and (3) the environment exposed the minor child to substance abuse. *Id.* § 2-3(1)(b).

¶ 8     The circuit court conducted a shelter care hearing on January 25 and 26, 2018. At the hearing, without objection, the circuit court took judicial notice of the findings and orders entered in In re Angelia F., No. 14-JA-21 (Cir. Ct. Champaign County),[1] terminating the respondents' parental rights regarding Angelia F., the minor child's older sibling. The circuit court found that there was probable cause to believe that the minor child was neglected based on the respondents' failure to seek and complete remedial services that led to the termination of their parental rights in In re Angelia F. *Id.*

¶ 9     The circuit court also found that DCFS had made reasonable efforts to prevent or eliminate the removal of the minor child from the home by the implementation of the safety plan. The circuit court did not find, however, that there was an immediate and urgent necessity regarding temporary custody. As such, the circuit court denied the State's request that the minor child be placed in temporary custody and directed that the minor child be released from protective custody. Finally, the circuit court appointed a special advocate (CASA) as guardian *ad litem* on behalf of the minor child and set the matter for an adjudicatory hearing.

¶ 10    The adjudication hearing was conducted by the circuit court on March 20, 2018. The circuit court found that the State had proven, by a preponderance of the evidence, that the minor child was neglected as defined by section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2018)),

---

[1]The findings and orders entered in In re Angelia F., No. 14-JA-21 (Cir. Ct. Champaign County), are not contained within the record on appeal. According to the respondents' brief, in that matter, the respondents were found to be unfit persons regarding their minor child, A.F., "for refusal to address mental health issues, for domestic violence, for failure to comply with service requirements, and for failure to complete services in Kankakee County cases involving three still-older siblings, (J.F., L.F., and B.F.)."

based on the minor child being in an environment that was injurious to his welfare as alleged in the petition for adjudication of neglect. The circuit court entered a written adjudicatory order the same day and scheduled the matter for a dispositional hearing.

¶ 11  On April 12, 2018, the Children's Home & Aid (CHA), acting on behalf of DCFS, filed a report with the circuit court. The CHA report stated that the service plan for Sandra required that she participate in parenting classes; obtain a mental health assessment and complete any recommended treatment; participate in random drug screens; complete a substance abuse assessment and comply with any recommendations of the substance abuse assessment; and participate in domestic violence services.

¶ 12  The CHA report stated that Sandra had been arrested on January 2, 2018, for driving on a suspended/revoked license and driving under the influence of alcohol (DUI). The CHA report further indicated that Sandra had failed to appear for her drug screening on March 2, 2018, but had completed drug screenings on March 6, 15, 23, and 28, 2018. The screenings conducted on March 6 and 15 were adulterated and as such, were counted as positive drug screenings. The results of Sandra's drug screenings conducted on March 23 and 28, 2018, were negative.

¶ 13  With regard to Frank, the CHA report stated that his service plan required that he participate in parenting classes; obtain a mental health assessment and complete any recommended treatment; participate in random drug screenings; complete a substance abuse assessment and comply with any recommendations of the substance abuse assessment; and participate in domestic violence services. According to the CHA report, Frank had failed to appear for his drug screening on March 2, 2018, but had completed drug screenings on March 6, 15, 23, and 28, 2018, all of which were negative for any substances. The CHA report further indicated that Frank had completed his initial intake regarding his mental health assessment but had not started or completed any counseling.

4

The CHA report stated that Frank had been "very angry and upset" when he had been informed of the services that he would be required to complete and that he had often been uncooperative and argumentative with the caseworker.

¶ 14    On April 18, 2018, the circuit court conducted a dispositional hearing and entered a written dispositional order on April 19, 2018. The circuit court found that the respondents were unfit, for reasons other than financial circumstances alone, to care for, protect, train, or discipline the minor child and as such, the health, safety, and best interest of the minor child would be jeopardized if the minor child remained in their custody. The circuit court noted that there had been longstanding and continuing issues of domestic violence between the respondents and that neither of the respondents had enrolled in domestic violence education or treatment. As such, the circuit court found that the minor child's current home was unsafe, directed that the minor child be made a ward of the court, and placed the custody and guardianship of the minor with the guardianship administrator of DCFS. Frank appealed the circuit court's dispositional order, and it was affirmed on appeal. *In re F.F.*, 2018 IL App (4th) 180309-U, ¶ 45.

¶ 15    Between July 2018, and April 2021, the circuit court reviewed this matter 10 times and entered a permanency order[2] pursuant to section 2-28 of the Act after each review. 705 ILCS 405/2-28 (West 2018). On July 6, 2021, the State filed a motion seeking findings of unfitness and termination of the respondents' parental rights regarding the minor child. The State's motion alleged that the respondents were unfit persons as defined in section 1(D)(m)(ii) of the Adoption

_____

[2]At the circuit court's hearing on the unfitness portion of the State's motion seeking a finding of unfitness and termination of parental rights on April 11, 2021, the circuit court stated in open court that "any findings regarding progress or efforts in a permanency order in this file—while I have taken judicial notice of the orders—I am ignoring that completely. Those findings as the case moves along through permanency purposes are something different." As such, this court will not summarize the circuit court's findings contained in the permanency orders or any reports filed for the circuit court's consideration at the permanency reviews.

5

Act, due to their failure to make reasonable progress towards the return of the minor child to the home during the period of October 26, 2020, through July 26, 2021. 750 ILCS 50/1(D)(m)(ii) (West 2020). The State's motion also alleged that it would be in the best interest of the minor child that the respondents' parental rights be terminated, and that guardianship of the minor child be permanently awarded to DCFS, with the authority to consent to his adoption.

¶ 16    The circuit court conducted a four-day hearing on the fitness portion of the State's motion on February 14, March 23, March 28, and April 11, 2022. The first witness to testify at the hearing was Dr. Judy Osgood. Prior to Dr. Osgood's testimony, the parties stipulated that Dr. Osgood was an expert in the field of psychology and was qualified to give opinions in that area.

¶ 17    Dr. Osgood testified that she had been a licensed clinical psychologist since 1987, and that in 2021, Frank had been referred to her for a parenting capacity assessment. Dr. Osgood stated that she had reviewed all of the reports and records from DCFS and One Hope United, acting on behalf of DCFS, including, but not limited to, the visitation reports, service plans, the integrated assessment, the substance abuse evaluation, and the domestic violence treatment report. Based upon her review, Dr. Osgood stated that Frank had an extensive mental health history since adolescence, including psychiatric hospitalizations, and had been diagnosed with bipolar disorder and histrionic personality disorder with narcissistic and schizotypal features. Dr. Osgood testified that the documentation she had reviewed also reflected that Frank had an extensive history of domestic violence, including an incident in 2020, where Sandra had stabbed Frank.

¶ 18    Dr. Osgood testified that she had met with Frank on one occasion on March 31, 2021, for approximately three hours. Dr. Osgood stated that she first met with Frank individually, and then the minor child was brought into the meeting, and she had observed Frank with the minor child. During her meeting with Frank individually, Dr. Osgood stated that Frank had informed her about

6

the circumstances that had resulted in the minor child being into care. When questioned about the domestic violence, Dr. Osgood testified that Frank acknowledged "pushing and shoving" between himself and Sandra but denied anything physical that led to any kind of injury. According to Dr. Osgood's testimony, Frank acknowledged that he and Sandra had been in an argument and that she had stabbed him; however, Frank "really minimized the domestic violence issues." Dr. Osgood stated that, according to the documentation, Frank had completed domestic violence services, but that it was her impression that the treatment had not been successful, given the stabbing incident.

¶ 19    Dr. Osgood further stated that Frank acknowledged that DCFS and the circuit court were concerned about Frank's and Sandra's mental health and substance abuse histories. Concerning his mental health, Dr. Osgood testified that Frank admitted to an extensive history of depression and treatment but denied taking any current medications. Dr. Osgood testified that it was her opinion that Frank's behavior matched the diagnosis of bipolar disorder "as evident in terms of a history of substance abuse, the domestic violence, the history of arrests, [and] reports of sexualized behaviors that had continued even during visits with his [minor child]." Dr. Osgood also opined that, based upon her review of his history and her interview with Frank, the diagnosis of histrionic personality disorder with narcissistic and schizotypal features was also an appropriate diagnosis for Frank. Dr. Osgood testified that Frank had not reported any current psychiatric treatment but had reported that he was engaged in counseling, although he had not reported any meaningful or specific treatment goals.

¶ 20    Dr. Osgood went on to testify that Frank had disclosed a long history of illegal drug use, including free-based cocaine, and problems with alcohol abuse. Dr. Osgood stated that she did not believe that Frank had been under the influence of any substance at the time of the meeting. Dr. Osgood stated that Frank had minimized the impact of domestic violence and substance abuse on

7

the minor children and that Frank had not taken any real responsibility for the significance of these problems.

¶ 21    At the time of the meeting, Dr. Osgood stated that Frank had reported that he was residing with Sandra, due to his home being lost in a fire, but that they were no longer in a relationship because "the courts don't like it." Dr. Osgood also stated that Frank had reported that it was his belief that he could provide care for the minor child and had presented himself as not having any problems serious enough to interfere with his ability to parent the minor child. Dr. Osgood testified, regarding her observation of Frank with the minor child, that Frank had been able to interact with the minor child age appropriately. Dr. Osgood stated, however, that minor child had not demonstrated any real separation anxiety and that the minor child had been fine with leaving Frank at the end of the visit.

¶ 22    Dr. Osgood testified that Frank had been participating in his services with DCFS; however, she had several specific concerns regarding Frank's parenting of the minor child based on her parenting capacity assessment. Specifically, Dr. Osgood stated that she was concerned with Frank's chronic mental illness and substance abuse history, and the lack of treatment. Dr. Osgood also testified that she was very concerned with the ongoing domestic violence in his relationship with Sandra and that, in spite of being stabbed by Sandra in 2020, Frank had moved back into a residence with Sandra. Dr. Osgood further testified that she was concerned with the reports of arguments between Frank and Sandra concerning their relationship during their visitations with the minor child.

¶ 23    Finally, Dr. Osgood testified that it was her expert opinion that, at the time she authored her report, she believed that Frank was not able to safely have unsupervised contact with the minor child. Dr. Osgood stated that she based this opinion on her previous comments regarding Frank,

8

and upon the minor child exhibiting symptoms of trauma after visitations. According to Dr. Osgood's testimony, it would take long-term progress in counseling, an absence of domestic violence, stability in his functioning, and the ability to empathize with the minor child to demonstrate that Frank could safely parent the minor child unsupervised. Dr. Osgood testified that she had not had any further contact with Frank or the minor child, nor had she reviewed any additional reports or documents, since the meeting on March 31, 2021.

¶ 24 Next, the State called Anne Kuna to testify. Kuna testified that she was employed by the Community Resource and Counseling Center (CRCC) as an adult and family therapist and worked with individuals on substance abuse and mental health issues. Kuna stated that she had begun conducting a substance abuse assessment with Sandra in June or July 2021, but that it had not completed until August 2021, because Sandra wanted to ensure that CRCC was accredited per her probation officer. Kuna testified that Sandra had been required to complete 75 hours of treatment due to her DUI charge.

¶ 25 Based upon the assessment, Kuna stated that Sandra had been diagnosed with alcohol abuse disorder. Kuna stated that the State had required Sandra to complete the highest amount of treatment hours because of her DUI, so Kuna had recommended substance abuse services that she believed would benefit Sandra. Kuna testified that Sandra began services in August 2021 but had never completed the services.

¶ 26 The next witness called by the State was Karen Kietzmann. Kietzmann testified that she was employed by One Hope United as a family support specialist. Kietzmann stated that from October 26, 2020, through July 26, 2021, she had supervised the visitation between the respondents and the minor child once a week and that the visits were held at the respondents' residence. Kietzmann further stated that she would pick up the minor child from his foster home and drive

him to see his parents for a two-hour visit. During these visits, Kietzmann testified that it was "quite often" that she could tell that Sandra was upset with Frank or vice versa. Kietzmann stated that, frequently, when one of the respondents had left the room, the other respondent quietly made comments, or snide remarks, about the other in front of the minor child.

¶ 27 Kietzmann testified that the respondents had always been prepared for the visits and had age-appropriate toys, but that the meals provided to the minor child had been "kind of slim," mainly dry cereal. Kietzmann also stated that the area of the home where the visits occurred had been "neatly cleaned" when she was there and also stated that the minor child's maternal grandma had been present at about 98% of the visits. Between October 26, 2020, through July 26, 2021, Kietzmann testified that the respondents had most of their visits together and that it was her belief that the respondents were residing together a lot during that period. Kietzmann testified that when Frank had a visit with the minor child alone, Frank would take the minor child to a restaurant for breakfast. Kietzmann stated that Frank had done well at these visits. Kietzmann stated that Sandra also had done well when visiting with the minor child alone.

¶ 28 According to Kietzmann's testimony, the respondents had not made any progress regarding their parenting skills. By that, Kietzmann stated she would have expected the respondents to be working together and agreeing on how to raise the minor child, such as the different activities the minor child would have been allowed, or not allowed, to do. Kietzmann testified, however, that for a couple of months, the minor child did not want to leave the respondents when the visitations had ended. Kietzmann further testified that at no point during her supervision of the visits, including the period ending in July 2021, had she ever reached a time where she felt it would have been appropriate for the respondents to have unsupervised visits because there had not been a

stable situation within the home. At the conclusion of Kietzmann's testimony, the circuit court continued the hearing until March 23, 2022.

¶ 29    On March 23, 2022, the hearing was resumed, and the State called Joseph Mooney to testify. Mooney indicated that he was a mental health therapist and had previously been employed with CRCC. While employed with CRCC, Mooney stated that he had been Sandra's therapist for a brief period of time, less than six months from approximately January to June 2021. Mooney stated that he had met with Sandra twice a month by telephone and that he had never met with Sandra in person because Sandra lacked transportation. According to Mooney's testimony, Sandra had attended a total of six out of nine possible meetings.

¶ 30    Mooney stated that he could not recall Sandra's treatment goals, but per his report, Sandra had made some progress as she had been able to find employment and had reported that she had abstained from substance use. Mooney testified that Sandra had not completed her substance abuse assessment at that time. Mooney stated that one of things he had worked on with Sandra had been her relationship with Frank and that Sandra had struggled with the thought of requiring Frank to move out of the home. Mooney concluded by stating that he had not successfully discharged Sandra from her individual counseling since Sandra still needed individual therapy to work through past trauma, as well as issues with depression and anxiety.

¶ 31    The next witness called by the State was Bettina Garner Earl. Garner Earl testified that she had previously been employed by CRCC as a mental health therapist. During that time, Garner Earl stated that she had provided services to Sandra and that she had treated Sandra prior to Mooney. Garner Earl testified that it had been Sandra's request to stop counseling with Garner Earl and transfer to another counselor. Garner Earl stated that she had met with Sandra every other

11

week, but that Sandra's attendance had been sporadic. Garner Earl testified that she had never successfully discharged Sandra from counseling.

¶ 32    Stephanie Beard then testified for the State. Beard testified that she was a licensed clinical counselor, and that she had treated Frank from December 2019 until either July or August 2021. In the beginning, Beard stated that she had met with Frank weekly, then after a while, biweekly, and then sometimes monthly. Beard stated that it had been difficult scheduling meetings with Frank's work schedule, but that he had always been communicative about scheduling appointments. Beard stated that she had met with Frank by telephone, and at times, in person.

¶ 33    Beard testified that Frank's treatment goals had been to understand why there was a foster care case, and his accountability and responsibility for whatever role he had played in the case being opened. Beard also stated that Frank needed to understand the dynamics between himself and Sandra, and the conflict that they had between the two of them, and that Frank needed to develop empathy and understanding of what the minor child was going through in terms of separation attachment and detachment between visits.

¶ 34    Concerning the goal of understanding why there was a foster care case, Beard stated that Frank had made progress, but that the goal had not been reached because, instead of looking internally, Frank had a pattern of looking externally. By "looking externally," Beard stated that Frank had difficulty understanding the totality of his role in the minor child being placed in foster care. Beard further testified that, in July 2021, she did not believe that Frank would refrain from placing the minor child in the same environment that had resulted in the minor child being taken into care.

¶ 35    Concerning Frank's relationship with Sandra, Beard testified that Frank had made progress with that goal, but that he had not met that goal as of July 2021. Beard stated that there still had

been a level of Frank not understanding what happens in a relationship, and she could not guarantee that with other stressors, the volatility would not occur again. Beard stated that she did not believe that Frank had resided with Sandra during the entire period from December 2019 through August 2021, but that it was her understanding that he had been residing with Sandra in July 2021. Beard testified that Frank had been displaced from his home due to a fire and that he had stated that he did not have anywhere else to reside. Beard testified that she believed Frank's return to residing with Sandra had been a backward step in his treatment.

¶ 36    Finally, concerning Frank's empathy for the minor child, Beard stated that she had worked with Frank on this goal and that he had made progress, but that Frank had not reached the goal by July 2021. Beard testified that Frank had still focused on what he believed was going wrong in the case instead of some "parenting attunement." Beard stated that Frank's attendance had been consistent and that he had been cooperative during their sessions; however, Frank had not been discharged from counseling.

¶ 37    The State then moved for a continuance, without objection, and the circuit court continued the hearing until March 28, 2022. On March 28, 2022, the State called its last witness, Bridgette Rasmussen, who testified that she had previously been employed by One Hope United as a foster care case manager from November 2020 through July 2021. During that entire period, Rasmussen stated that she had worked with the respondents and the minor child.

¶ 38    Rasmussen stated that when she first met with the respondents, they were residing together and that she had been concerned, given the ongoing domestic violence. Rasmussen stated that the respondents had acted as "separate entities" and that she had not believed this was a conducive environment in which to raise a child. During this time, Rasmussen stated that Sandra had reported that she and Frank were residing together but were not in a romantic relationship.

13

¶ 39    Rasmussen testified that the services Sandra had been required to complete were domestic violence services; a substance abuse evaluation and, if recommended, substance abuse treatment; drug screenings; mental health or individual counseling; parenting services; and visitation. Concerning Sandra's domestic violence services, Rasmussen stated that Sandra had completed those services in August 2019; however, there had been an incident in January 2020 where Sandra stabbed Frank. Because of the incident, Rasmussen testified that Sandra had been required to address domestic violence with her individual counselor at CRCC. With regard to her individual counseling, Rasmussen stated that Sandra had been attending, but that she had not been successfully discharged by July 2021.

¶ 40    Rasmussen testified that Sandra had completed her parenting classes by July 2021. Rasmussen further testified that Sandra had not been consistent in her drug screenings and had missed all four drug screenings scheduled from June 10 through July 14, 2021. Rasmussen also stated that Sandra had testified positive for marijuana and opiates in the fall of 2020. According to Rasmussen's testimony, she had spoken to Sandra concerning the positive results and Sandra had reported that she had a prescription that she gave to the caseworker at the time. Rasmussen stated, however, that she had not been able to locate a prescription within the file. Rasmussen went on to testify that, at a later positive screening, Sandra had provided a valid prescription.

¶ 41    Rasmussen also testified that in December 2020, Sandra had not completed her substance abuse assessment and that Sandra had reported that she had not been able to afford it. As such, Rasmussen stated that she had made a referral for Sandra for substance abuse treatment and services at CRCC. Rasmussen testified that Sandra had completed 6 or 7 hours of her court ordered 75 hours of substance abuse treatment and had completed half of her intake assessment with CRCC, but that Sandra had not completed a single hour of substance abuse treatment from

14

November 2020 through July 2021. Rasmussen further testified that she had provided Sandra with numerous narcotic and alcohol anonymous meetings in the area, but that Sandra never attended a meeting.

¶ 42 Rasmussen went on to testify that Sandra had been consistent in her visitation with the minor child, but that Rasmussen had never considered unsupervised visitation because Sandra had not been on track to complete her services. Rasmussen also testified that she had been concerned regarding the interactions between Sandra and the minor child. Rasmussen stated that one such concern had been that the minor child preferred to be addressed by his middle name, and Sandra refused to do so. Rasmussen testified that as of May 2021, the minor child had been in foster care for approximately three years. Rasmussen also stated that Sandra's visitations with the minor child had been suspended in either May or June 2021 for her failure to complete her drug screenings.

¶ 43 Regarding Frank, Rasmussen testified that the services Frank had been required to complete were parenting classes; a substance abuse evaluation and, if recommended, treatment; drug screenings; mental health or individual counseling; domestic violence services; and visitation with the minor child. Rasmussen stated that Frank had completed his substance abuse assessment in May 2018 and was not recommended for any follow up treatment. Rasmussen stated that Frank had been consistent in his drug screenings and that all of his screenings had been negative for any substance, including alcohol.

¶ 44 Rasmussen also testified that Frank had completed his parenting classes and had been referred for a parenting capacity assessment with Dr. Osgood. Rasmussen testified that Frank had been referred for the parenting capacity assessment because she still had concerns about Frank's ability to connect with the minor child. Rasmussen further testified that Frank had completed his domestic violence services, but that she still had been concerned because there remained a volatile

15

relationship between him and Sandra, regardless of whether the relationship was romantic or not. Rasmussen testified that she had been receiving reports of verbal abuse from the respondents, individually, against the other respondent. Rasmussen stated, for example, that Sandra had reported that, when Frank was not residing with her, there were sex acts or drug use going on in the residence where Frank was staying and that the statement was made in front of the minor child. Rasmussen testified that there had also been inappropriate conversations in the presence of the minor child during some of the visits. During one visit, Rasmussen stated that Frank allegedly named towns in the United States that had sexually relevant names, such as Blue Balls, Pennsylvania, in the presence of the minor child.

¶ 45    With regard to Frank's counseling services, Rasmussen stated that Frank had been engaged in counseling, but that he had not been successfully discharged as of July 2021. Rasmussen also stated that Frank had been consistent in his visitations with the minor child; however, there had been snide comments between Frank and Sandra during the visits, and it had been apparent that they did not like sharing their visitation hours. Rasmussen stated that Frank had housing instability starting in April 2021, and that he had been referred to a housing counselor, but by July 2021, Frank had not obtained stable housing and was residing with Sandra. Finally, Rasmussen testified that Frank had been cooperative with her and that he had not refused to participate in any of the services that had been recommended.

¶ 46    Frank was then called as witness on his own behalf. Frank testified that he was the father of the minor child, and that he had cooperated with all of his required services. Frank stated that he had completed his parenting classes; cooperated in a parenting capacity assessment; completed a substance abuse assessment; completed all required drug screenings; and completed domestic

16

violence counseling. Frank further testified that he had cooperated with individual counseling, but when the State's motion for termination was filed, individual counseling was terminated by DCFS.

¶ 47    Frank went on to testify that Dr. Osgood had incorrectly testified that he had a history of DUIs, because he had never been convicted of a DUI. Frank further stated that the depression diagnosis that Dr. Osgood had referenced was a diagnosis he had received as a teenager, and he was now 57 years old and currently had no issue with depression. Frank testified that he was not on any medication for mental health issues, nor had any medical professional recommended medication for any mental health issue except when he was a teenager.

¶ 48    Frank also testified that his visitations with his minor child went well. Concerning the inappropriate comments about the towns' sexual names, Frank stated that it had been something that came up on the television and it had been brought up by someone else, so it was not a conversation that he had started. Frank stated that he remained employed, but that he was currently on medical leave due to surgeries on both of his hips.

¶ 49    Next, Sandra testified on her own behalf. Sandra stated that she was the mother of the minor child and that she had completed her domestic violence services in 2019. Sandra testified that she had begun individual therapy in 2018, and had switched counselors to Mooney in 2020, because she had not believed that she had been receiving the help she needed. Sandra stated that CRCC and Mooney had set up the meeting telephonically, and that she had no difficulties with transportation. Sandra stated that her counseling goals with Mooney had been to maintain her residence, obtain employment, and provide the care that the minor child needed. Sandra testified that she had maintained her residence and had been employed "for a little while."

¶ 50    Sandra further testified that she had participated in her required drug screenings and acknowledged that she had positive drug screenings for opiates in October 2020 and March or

17

April 2021. Sandra stated, however, that she had been prescribed Tylenol 3 after two dental procedures and had provided the prescriptions to her caseworker. In the beginning of 2020, Sandra stated that she had started her substance abuse treatment, but that the program had been stopped due to the pandemic. Then in March 2021, Sandra stated that she had completed half of her substance abuse assessment at CRCC, but that she could not complete the assessment until she had provided CRCC's accreditation to her probation officer. Sandra also testified that the individual conducting the assessment had been absent for six weeks for medical reasons, and that Sandra had finally been able to complete her assessment and begin treatment in August 2021.

¶ 51    Sandra next testified that she had completed her parenting classes and had attended her scheduled visitations with the minor child. Sandra stated that she was no longer in a relationship with Frank, but that from October 26, 2020, through July 26, 2021, Frank had resided with her for several months because his residence had been lost due to arson.

¶ 52    At the conclusion of Sandra's testimony, the circuit court continued the hearing until April 11, 2021. On that date, the circuit court heard the parties' closing arguments and then presented its findings[3] in open court. Based upon those findings, the circuit court held that the State had proven, by clear and convincing evidence, that the respondents were unfit persons as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)), due to their failure to make reasonable progress towards the return of the minor child to the home during the period of October 26, 2020, through July 26, 2021. The circuit court scheduled the matter for a best interest

---

[3]The circuit court gave a lengthy and detailed explanation of its findings regarding the evidence presented at the hearing, along with the relevant standards by which a circuit court is required to make its determination. In the interest of brevity, we will summarize the circuit court's findings relevant to this appeal in our analysis.

hearing and directed DCFS to prepare a report concerning the best interest of the minor child to be provided to the circuit court and all parties at least five days prior to the next hearing.

¶ 53     On May 4, 2022, CASA, as guardian *ad litem* for the minor child, filed a best interest report with the circuit court. The CASA report stated that Frank and Sandra had a long history of domestic violence and had petitioned, and received, various orders of protection against each other during the time when the minor child had been present and exposed to such violence. The CASA report also stated that Sandra had a history of substance abuse.

¶ 54     The CASA report further stated that the minor child was thriving and had become an integral part of the foster family. The minor child was happy, and did well in school, but had been recently diagnosed on the autism spectrum. The CASA report indicated that the minor child's foster family had purchased private insurance costing approximately $1000 per month so that the minor child could receive help through ABA therapy[4] with the effects of his autism.

¶ 55     The CASA report went on to state that the minor child enjoyed physical safety, as well as emotional security, in his foster setting and had received all necessary medical treatment. The CASA report also stated that the minor child had been with his foster family since April 26, 2018, when he was 16 months old, and that he was currently 5 years old. The CASA report indicated that the minor child had bonded with his foster family and that, although the minor child had visited with the respondents monthly, he had not shown any evidence of missing them. The CASA report went on to state that the minor child, "having been pulled and pushed from one domestic situation to another since he was born," needed and deserved the opportunity to continue to live with a sense of "really belonging in a home with loving parents and siblings." As such, the CASA report

---

[4]Applied behavior analysis (ABA) is the practice used most extensively in special education and the treatment of autism spectrum disorder that applies the psychological principles of learning theory in a systematic manner to modify behavior. www.appliedbehavioranalysisedu.org (last visited Oct. 21, 2022).

recommended to the circuit court that the respondents' parental rights be terminated and that the minor child be allowed to move toward permanency with his foster parents.

¶ 56    DCFS filed its best interest report with the circuit court on May 13, 2022. The DCFS report addressed each factor, in the context of the minor child's age and developmental needs, that the circuit court was statutorily required to consider in its determination of the best interest of the minor child. 705 ILCS 405/1-3(4.05) (West 2020). The DCFS report reflected much of the same information that had been provided in the CASA report, in that the minor child had been in a loving and stable environment; that the physical safety and welfare of the minor child were met, including food, shelter, health, and clothing; that the minor child had been in his current placement for much of his life and had a strong bond with his foster family; that the minor child had a sense of security; and that separating the minor child from his foster family would cause irreversible trauma as his foster placement had been the only stable home he had known. As such, the DCFS best interest report stated that the respondents were unable to parent the minor child and that adoption by his foster parents would be in the best interest of the minor child.

¶ 57    On June 9, 2022, the circuit court conducted a best interest hearing. At the beginning of the hearing, the circuit court inquired whether any party had additions or corrections to the CASA or DCFS best interest reports. The parties acknowledged that they had reviewed the reports and had no additions or corrections to the reports. The only witness called at the best interest hearing was Sandra. Sandra stated that she had cared for the minor child for a year and a half prior to the minor child being taken into care and that she believed that it was not in the minor child's best interest for her parental rights to be terminated. According to Sandra's testimony, the minor child had not wanted to return to his foster home after visiting with her. Sandra also testified that the minor child was familiar with his extended, biological family, including his other siblings. Sandra

20

stated that she was able to address all of the minor child's needs and that the minor child had indicated to her that he would prefer to reside with her rather than his foster home.

¶ 58   After Sandra's testimony and further arguments, the circuit court stated in open court that it had considered the reports filed and the evidence presented at the best interest hearing. The circuit court orally addressed each statutory factor, noting that it did so from the minor child's perspective and the perspective of the minor child's best interest. The circuit court stated that it found, by a preponderance of the evidence, and by clear and convincing evidence, that it was in the best interest of the minor child and the public, that all residual, natural parental rights, and responsibilities of the respondents be terminated. As such, the circuit court terminated the respondents' parental rights and responsibilities regarding the minor child and entered a written order the same day reflecting its oral judgment.

¶ 59   The respondents each filed a timely notice of appeal, and on August 17, 2022, Frank filed a motion to consolidate the appeals. The same day, this court granted the motion to consolidate. On appeal, the respondents argue that the circuit court's findings that the respondents were unfit persons, and that termination of their parental rights was in the best interest of the minor child, were against the manifest weight of the evidence.

¶ 60                                    II. ANALYSIS

¶ 61   "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28. The Act (705 ILCS 405/1-1 *et seq.* (West 2020)), along with the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)), governs the proceedings for the termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). The Act provides a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The State must first establish,

21

by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. 705 ILCS 405/2-29(2) (West 2020); *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28.

¶ 62    A determination of parental unfitness involves factual findings and credibility assessments that the circuit court is in the best position to make, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is arbitrary, unreasonable, and not based on the evidence." *In re G.W.*, 357 Ill. App. 3d 1058, 1059 (2005). In this matter, the respondents argue that the circuit court's findings at both stages of the termination proceedings were against the manifest weight of the evidence. As such, we begin our analysis with the issue of whether the circuit court erred in its determinations that the respondents were unfit persons.

¶ 63                                    A. Unfitness Findings

¶ 64    The circuit court found that the State had proven, by clear and convincing evidence, that the respondents were unfit persons as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)). Section 1(D)(m)(ii) of the Adoption Act defines a person as unfit when that person fails to make reasonable progress toward the return of the minor child to the home during any nine-month period following the adjudication of neglect or abuse. *Id.* The statute allows the circuit court to consider any nine-month period after the adjudication of neglected or abused, regardless of the length of time that the matter had been pending in the circuit

22

court. *Id.* In this matter, the relevant nine-month period stated in the State's motion, and considered by the circuit court, was October 26, 2020, through July 26, 2021.

¶ 65 The circuit court found that neither of the respondents had made reasonable progress toward the return of the minor child to the home during the period of October 26, 2020, through July 26, 2021. Reasonable progress is an objective standard that is not concerned with a parent's individual efforts and abilities. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). Instead, the courts review reasonable progress using an objective standard relating to making progress toward the goal of returning the child home. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). Reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress can be found if the circuit court can conclude that it can return the minor child to the parent in the near future. *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22. Although DCFS service plans are an integral part of the statutory scheme, our supreme court has rejected the view that the sole measurement of parental progress is the parent's compliance with service plans. *In re C.N.*, 196 Ill. 2d 181, 214-15 (2001). As our supreme court stated in *In re C.N.*, 196 Ill. 2d 181 (2001):

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17.

¶ 66 Moreover, it has been repeatedly stated that "a court is duty bound to ensure that serious parental deficiencies of whatever nature have been corrected before the court permits one of its wards to be returned to that parent's custody." *In re L.L.S.*, 218 Ill. App. 3d 444, 464 (1991); see also *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999); *In re C.S.*, 294 Ill. App. 3d 780, 790 (1998).

23

¶ 67                                    1. Frank F.

¶ 68    Frank argues that the circuit court erred in finding him an unfit person because, prior to the period of alleged unfitness, he had completed his parenting classes, a substance abuse assessment that indicated no need for treatment, and his domestic violence classes. Frank states that he consistently appeared for his drug screenings, which were all negative for any substance, and consistently exercised his visitations. Frank argues that he had been involved in his individual counseling until DCFS discontinued the counseling when the State filed its motion to terminate parental rights. Frank states that the testimony of Stephanie Beard demonstrated that he had made progress on his counseling goals; that the testimony of Rasmussen evidenced that he had never declined a recommended service; that the testimony of Kietzmann demonstrated that the home was neat and there had been no safety concerns; and that his own testimony evidenced his bond with the minor child and his continued employment.

¶ 69    Frank further argues that Dr. Osgood's testimony was based, in part, on erroneous information that had likely prejudiced her. Frank states that the erroneous information included a claim that Frank had a number of DUI tickets, which was untrue, and that he had an extensive history of mental illness. Frank states that his only mental health issues had occurred when he was a teenager and, at the time of the hearing, he was 58 years old. As such, Frank argues that the State had failed to prove, by clear and convincing evidence, that Frank was an unfit person for failing to make reasonable progress toward the return of the minor child to the home during the period of October 2020 to July 2021, and that the circuit court's finding that he was an unfit person was against the manifest weight of the evidence.

¶ 70    The circuit court stated that it had found Frank's testimony regarding his DUI history credible, and also acknowledged that Frank's history of depression and treatment dated back 35 or

24

40 years. The circuit court stated, however, that Dr. Osgood's "observations and gathering of records and review goes way beyond that," and "those two problems aren't the core of what opinion she had and developed." The circuit court stated that it had found Dr. Osgood's testimony to be credible, including her mental health assessment that Frank had bipolar disorder along with histrionic personality disorder with narcissistic and schizotypal features that affected the home environment, most notably present through domestic violence. The circuit court noted that Dr. Osgood had testified that these were chronic conditions that Frank had not been properly treating and that Frank would need specific counseling goals in order to address his mental health issues. The circuit court went on to state that:

> "It's that diagnosis of histrionic personality disorder with narcissistic and schizotypal features, that's what was coming through here in the information that [Dr. Osgood] was giving. That's what comes through, frankly, in the testimony of a lot of the witnesses. [Frank] minimized the [e]ffects of mental health issues, domestic violence, substance abuse too on [the minor child]. [Frank] just—he didn't recognize the seriousness of the problems in a home environment which was completely consistent with that diagnosis."

¶ 71     The circuit court also noted that Frank had acknowledged to Dr. Osgood that there had been domestic violence in this relationship with Sandra, including the fact that Sandra had stabbed Frank, yet Frank minimized the domestic violence issues in his interview and minimized the problem that domestic violence would play in the home environment for the minor child. The circuit court stated that, although Frank had testified that he and Sandra were no longer in a relationship, they had still resided together; that Frank continued to refer to Sandra as his "other half"; and that Frank had made statements that he and Sandra were not together because "the court did not like it."

25

¶ 72    The circuit court also made positive findings regarding Frank, including the finding that there was a bond between Frank and the minor child, and that Kietzmann had testified to good things about Frank's interaction with the minor child. The circuit court, however, also stated that Kietzmann had testified that there had been a constant undercurrent of tension and hostility between Frank and Sandra throughout the period, and that Frank had no real concern about what that meant for the minor child. The circuit court found that Frank was participating and completing his services but stated that it was not "about checking off boxes," but making a change to move forward so that Frank could safely parent the minor child. The circuit court further addressed Beard's testimony regarding Frank's specific goals and his progress toward those goals, but that Frank had not been near completing those goals since he had continued to minimize his responsibility and accountability. As such, the circuit court found that it was not reasonable, in July of 2021, that custody of the minor child could have been returned to Frank at any time in the near future and that the State had proven, by clear and convincing evidence, that Frank was an unfit person.

¶ 73    Our review of the circuit court's findings indicates that the circuit court carefully considered the testimony of all the witnesses, including the testimony that Frank cites in support of his argument. As previously stated, the circuit court is in the best position to make factual findings and credibility assessments and this court will not substitute its judgment for that of the circuit court. *In re Tiffany M.*, 353 Ill. App. 3d at 889-90. In this matter, we do not find that the opposite conclusion is clearly evident or that the circuit court's findings were arbitrary, unreasonable, and not based on the evidence.

¶ 74    Although Frank's efforts were commendable, his compliance with his service plan was not the sole measurement that the circuit court was required to consider. *In re C.N.*, 196 Ill. 2d at 214-

26

15. Frank remained in counseling and Dr. Osgood testified that it was her expert opinion that Frank was not able to safely have unsupervised contact with the minor child. Kietzmann testified that neither of the respondents had made any progress regarding their parenting skills, and Rasmussen testified that Frank had completed his domestic violence services, but that she still had been concerned because there remained a volatile relationship between he and Sandra.

¶ 75    As such, we find that there was sufficient evidence for the circuit court to determine that, in July 2021, there were unresolved issues that would have prevented the court from returning custody of the minor child to Frank in the near future. We therefore hold that the circuit court's finding that Frank was an unfit person, as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)), due to his failure to make reasonable progress towards the return of the minor child to the home during the period of October 26, 2020, through July 26, 2021, was not against the manifest weight of the evidence.

¶ 76                                    2. Sandra F.

¶ 77    Sandra also cites to the positive testimony regarding her fitness in support of her argument that the circuit court erred in finding her an unfit person. Sandra states that she had completed her domestic violence classes in August 2019 but acknowledges that she and Frank had another incident of violence in January 2020. Sandra argues, however, that the incident occurred 10 months prior to the relevant period and that no further incidents followed.

¶ 78    Sandra states that she also completed her parenting classes and that the two drug screenings that were positive for opiates were due to her prescription for Tylenol 3. Sandra states that the pandemic and costs interfered with her attempt to complete the substance abuse assessment, but that she had completed half of the assessment during the relevant period. Sandra goes on to state that she consistently exercised her visitation.

¶ 79 Our review of the record indicates that, as it did with Frank, the circuit court carefully considered the positive testimony regarding Sandra's fitness. The circuit court found, however, the same unresolved issue of domestic violence as it did with Frank. Unlike Frank, the circuit court also found that substance abuse was a serious issue for Sandra. The circuit court noted that Sandra's substance abuse had been one of the issues, and one of the bases, of the adjudication in March of 2018, and that Sandra was aware of the issue and the need to address it long before the pandemic. The circuit court noted that Sandra had not been consistent in her drug screenings and that during the time period from June 10 to July 14, 2021, Sandra had not participated in any of her scheduled drug screenings. The circuit court further noted that Sandra had only completed six to seven hours of substance abuse treatment as of July 2021. As such, the circuit court found that Sandra's substance abuse issue had not been resolved, and could not be resolved in the near future, such that the minor child could be returned to Sandra's care.

¶ 80 We do not find that the opposite conclusion is clearly evident or that the circuit court's findings were arbitrary, unreasonable, and not based on the evidence. Therefore, we find that the circuit court's finding that Sandra was an unfit person as defined in section 1(D)(m)(ii) of the Adoption Act (*id.*), due to her failure to make reasonable progress towards the return of the minor child to the home during the period of October 26, 2020, through July 26, 2021, was not against the manifest weight of the evidence.

¶ 81                                    B. Best Interest

¶ 82 Together, the respondents argue that the circuit court's finding that it was in the minor child's best interest to terminate their parental rights was against the manifest weight of the evidence. The respondents argue that, at the time of the best interest hearing, Sandra had made improvements in her therapy and was "two-thirds through her substance abuse treatment." The

28

respondents also argue that Frank remained employed, and that Sandra had testified that the minor child did not want to return to his foster home and that it was the minor child's preference to live with her. The respondents further argue that the minor child had a strong bond with the respondents and that the respondents no longer resided together, so the problems that existed with joint visits no longer occurred. As such, the respondents state that severing the minor child's relationship with the respondents would inevitably and adversely affect the development of his identity.

¶ 83    In determining the best interests of the child, the circuit court must consider the following statutory factors in the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and a sense of being valued, the child's sense of security, the child's sense of familiarity, the continuity of affection for the child, and the least disruptive placement alternative for the child; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, which includes a need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). The court is not required to make specific findings of fact concerning the best interest factors as long as there is some indication in the record that it considered the enumerated factors when making the best interests determination. *In re Marriage of Stribling*, 219 Ill. App. 3d 105, 107 (1991).

¶ 84    In this matter, the circuit court stated that the respondents "absolutely love their son, always have loved their son," and found that there was a bond between the minor child and both of the respondents. The circuit court also acknowledged that the respondents had "put a lot of work into

29

trying to do what they had to do to be there for their son." The circuit court, however, found that Sandra had not reached a place where she could dependably and consistently be relied upon to provide for the physical safety and welfare of the minor child and that Frank still struggled to understand and accept the issues regarding his mental health that impact his ability to provide a safe, appropriate, nurturing home. As such, the record reflects that the circuit court considered the bond between the respondents and the minor child, and also considered the efforts the respondents had made concerning their services.

¶ 85    The circuit court further found that the minor child had been in his foster home since he was a year and a half old and had a strong bond with his foster family. The circuit court stated that the foster home had been a stable place for the minor child and that the minor child regarded his foster parents as his parents, and his foster brother as his little brother. The circuit court found that the minor child had a sense of security in his foster home and that the minor child had "a wonderful, stable, long-term potential home and has had this same home for more than four years. That's permanence."

¶ 86    The respondents do not allege, nor does the record indicate, that the circuit court failed to consider the enumerated factors when making the best interests determination. The circuit court acknowledged and evaluated the evidence related to the respondents' progress and the bond that the respondents had with the minor child and found that those considerations did not outweigh the evidence in favor of termination. After considering the reports, the evidence presented at the best interest hearing, and the statutory factors, the circuit court found, by a preponderance of the evidence and also by clear and convincing evidence, that it was in the best interest of the minor child and the public that the respondents' parental rights and responsibilities be terminated.

30

¶ 87    After carefully reviewing the record and in light of the best interest factors that must be considered, we do not find that the opposite conclusion is clearly evident or that the circuit court's findings were arbitrary, unreasonable, and not based on the evidence. As such, we find that the circuit court's determination that it was in the best interest of the minor child to terminate the respondents' parental rights was not against the manifest weight of the evidence.

¶ 88    Therefore, we find that the circuit court's judgment terminating the respondents' parental rights, based on its findings that the respondents were unfit persons, and that termination of their parental rights was in the minor child's best interests, was not contrary to the manifest weight of the evidence.

¶ 89                                III. CONCLUSION

¶ 90    Based on the foregoing, we affirm the judgment of the circuit court.

¶ 91    Affirmed.