723 N.E.2d 397 (2000)
309 Ill. App.3d 581
243 Ill.Dec. 365
In re D.D., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
M.D., Respondent-Appellant).
No. 2-99-0488.
Appellate Court of Illinois, Second District.
January 12, 2000.
*399 Phyllis J. Perko (Court-appointed), Law Offices of Harlovic & Perko, West Dundee, for M.D.
David R. Akemann, Kane County State's Attorney, St. Charles, Martin P. Moltz, Deputy Director, Cynthia N. Schneider, State's Attorney Appellate Prosecutor, Elgin, for the People.
Presiding Justice BOWMAN delivered the opinion of the court:
Respondent, M.D., appeals the circuit court's judgment that terminated his parental rights to his son, D.D. Respondent contends that the State did not prove by clear and convincing evidence that he failed to make reasonable progress toward the goal of returning the minor to his custody. He also contends that the second ground the court relied on for termination, respondent's "repeated incarceration," does not apply because respondent has been imprisoned only once since the minor's birth.

I. Background
D.D. was born July 17, 1996, with cocaine in his system. He was placed in foster care immediately after his birth and has lived with a foster family ever since. At the time of D.D.'s birth, respondent was in the Kane County jail awaiting trial on charges of home invasion and armed violence. He was later convicted and received concurrent sentences of 10 and 6 years' imprisonment. At the time of trial, he resided at the Sheridan Correctional Center.
Shortly after the minor's birth, his mother, Penny Warren, asked Elizabeth Washington, who subsequently married respondent, to take custody of him. Washington agreed and she and respondent purchased a number of items for the baby. However, the Department of Children and Family Services (DCFS) would not allow Washington to have custody because she had a criminal record.
The State filed a petition against respondent and Warren to have the minor declared neglected because he was born with cocaine in his system. Respondent stipulated to this allegation and Warren was defaulted.
On March 9, 1998, the State filed a petition to terminate the parental rights of respondent and Warren. The petition alleged numerous grounds of unfitness against respondent, including that he failed to make reasonable progress toward the return of the minor within 12 months of the adjudication of neglect (see 750 ILCS 50/1(D)(m) (West 1996)) and that his repeated incarceration would prevent him from discharging his parental duties (see 750 ILCS 50/1(D)(s) (West 1998)).
From the time the case was opened, DCFS made diligent attempts to contact Warren but was unsuccessful. The trial court terminated her parental rights. That order is not challenged on appeal.
*400 At trial, Charles Moon of DCFS testified that he was the first caseworker assigned to the matter. He drafted the initial client service plan in August 1996. No tasks were set for respondent at that time, and it was difficult to establish visitation when he was in the county jail.
The January 1997 service plan required respondent to, among other things, participate in "services available which are appropriate." Respondent was rated "satisfactory" because he had put his name on a waiting list for services.
In the July 1997 service plan, respondent was required specifically to sign up for the substance abuse program at Sheridan, complete a substance abuse assessment and follow its recommendations, sign up for parenting classes, seek out psychological services offered at Sheridan, participate in counseling, and sign appropriate releases. Respondent was rated satisfactory to the extent that he was on a waiting list for substance abuse and parenting programs, but unsatisfactory in that he had not requested psychological services.
The last plan Moon drafted was in January 1998. Respondent was required to complete a drug abuse assessment to determine if he needed treatment, complete parenting classes, and participate in psychological counseling. Respondent was rated unsatisfactory in that he had not obtained a drug abuse assessment. However, the report notes that respondent was not eligible for services at Sheridan until two years from his scheduled release date.
Moon testified that he required parenting classes because the minor had cried during visitations, respondent had not had much contact with his other children as a result of being incarcerated for extended periods, and respondent had set a bad example by his criminal history. Moon said that respondent's mother, P.D., had told him she suspected respondent of using drugs, although respondent denied that he did so. Psychological services were required to determine whether respondent had "behavioral issues," given his criminal history. Moon acknowledged that Sheridan's policy is to give prisoners with earlier release dates preference in receiving services.
Until December 1997, respondent attended visitations with the child except one time when the prison was on lockdown status. Respondent then temporarily discontinued visitations, citing health concerns during the winter.
Steven Stocker supervises correctional counselors at Sheridan. Programs available to inmates there include educational and vocational programs, anger management counseling, substance abuse treatment, and cooperative work training (CWT) classes that cover such matters as parenting, budgets, and job applications. The waiting list for CWT was about two months.
In January 1999, respondent requested enrollment in parenting classes. These classes, however, are not listed separately but are considered part of the CWT program. Respondent was not enrolled in a substance abuse program or anger management classes, apparently because he had not requested them. An inmate generally cannot enroll in the substance abuse program unless his "out-date," or release date, is less than three years away. Darlene Bridge, record supervisor and litigation coordinator at Sheridan, testified that respondent's out-date is June 24, 2001.
Rachel Weiss took over as respondent's caseworker in February 1998. She reviewed the January 1998 service plan in July 1998. She rated respondent unsatisfactory for failing to complete the required services.
Each service plan contained a visitation task. Although visitations were not occurring when Weiss took over the case in February, they resumed in May 1998. Patricia Kozlowski, a case aide for Carlton Health Care, normally supervised the visits. Weiss planned to attend the July 1998 visitation herself because Kozlowski and *401 the foster parents had expressed concern about the minor's behavior during the previous two visits. However, respondent canceled that visit, as well as two scheduled for September, because he objected to Weiss's presence. On appeal, respondent does not dispute that this was the reason the visits were canceled.
A visitation did take place in November. However, D.D. was "difficult to engage." After making some efforts to get the minor to look at him, respondent spent most of the time talking to Weiss and the foster parents. At the December visit, respondent spent very little time with the minor. He spent most of the time talking to the foster parents. Respondent was also trying to communicate nonverbally with another inmate in the room. Weiss ended the visit after about 45 minutes because there was no interaction between respondent and the minor.
The July 1998 service plan that Weiss drafted called for respondent to attend anger management classes and parenting classes and to participate in individual therapy. In the January 1999 evaluation, parenting classes and individual therapy were discontinued because respondent was not then eligible for those services. However, he was rated unsatisfactory for failing to participate in anger management classes that were available. Visitation was also rated unsatisfactory because respondent had refused three visits.
Weiss drafted another plan in January 1999 that included participation in the CWT program and anger management, but not substance abuse services. The anger management task was included because of respondent's history of violent crime. Weiss discussed potential services with respondent by telephone in January 1999. Respondent said that he had not made up his mind about what services in which to become involved.
Weiss testified that respondent had threatened her during a court hearing in September 1998 when he said that she had disrespected his mother and "should have her teeth knocked down her throat." Weiss became concerned for both her safety and that of the foster parents when, during the November visitation, respondent stated that he knew where the foster parents lived.
Respondent's mother, P.D., testified that she had never seen respondent use drugs. She told Moon that she simply could not say if her son used drugs because he would not allow her to see such conduct even if he engaged in it.
Washington, now known by respondent's surname, testified that she had known respondent for about five years and that they were married in the Kane County jail in December 1996. Penny Warren had contacted her about raising the child whom she was then expecting. Washington found respondent to be mellow and good-natured. He had never been violent toward her.
The trial court terminated the parental rights of respondent and Warren. The court found that the State proved by clear and convincing evidence that respondent was an unfit parent because he failed to make reasonable progress toward the return of the minor and because his repeated incarceration prevented him from fulfilling his parental responsibilities. Following a "best interests" hearing, the court granted DCFS the power to consent to the minor's adoption. Respondent filed a timely notice of appeal.
Respondent first contends that the State did not prove that he failed to make reasonable progress toward the minor's return. Respondent first notes the trial court's statement that his incarceration was one of the bases for the minor's removal from his parents' custody. However, the only basis for removal listed in the neglect petition was that the child was born with cocaine in his system. According to respondent, In re S.J., 233 Ill. App.3d 88, 174 Ill.Dec. 259, 598 N.E.2d 456 (1992), mandates that only the reason for the initial removal may be used to measure *402 a parent's progress. Respondent reasons that, because the minor no longer has cocaine in his system, respondent must be deemed to have made reasonable progress from the condition that caused the initial removal. Therefore, respondent asserts, the trial court could not consider his failure to complete the various tasks outlined in the service plans because they did not relate to the condition that caused the initial removal.
The State apparently accepts respondent's reading of S.J. and argues that it should be overruled. The State suggests that we follow In re C.S., 294 Ill.App.3d 780, 229 Ill.Dec. 225, 691 N.E.2d 161 (1998). In the latter case, the Appellate Court, Fourth District, criticized S.J., stating that "it makes no sense to so narrowly limit what the trial court can order a respondent parent to do following an adjudication of neglect, abuse, or dependency." C.S., 294 Ill.App.3d at 789, 229 Ill.Dec. 225, 691 N.E.2d 161.
However, the parties, as well as the fourth district, have severely misread S.J. Like the parties in this case, C.S. takes several sentences from our lengthy opinion out of context and concludes that they mean that the trial court may not consider any conduct by the parents except that which happened to be listed as the basis for the initial removal of the child from their custody. C.S. then asks, rhetorically, why a trial court should be expected to ignore a potentially life-threatening condition merely because it came to light after the initial removal. C.S., 294 Ill.App.3d at 789, 229 Ill.Dec. 225, 691 N.E.2d 161. We agree that such an absurd result is not warranted, and nothing in S.J. holds to the contrary.

II. Standard for Measuring Reasonable Progress
Because this issue continues to generate confusion and controversy, we further explain the considerations behind S.J. and cases following it. In S.J., as in this case, the original reason for DCFS's intervention was the minor's birth with cocaine in his system. S.J., 233 Ill.App.3d at 91, 174 Ill.Dec. 259, 598 N.E.2d 456. In considering whether the respondent mother had made reasonable progress, the court noted that the "benchmark" for measuring such progress is "the situation which triggered the initial removal" of the minor or "the conditions in existence when custody was taken." S.J., 233 Ill.App.3d at 119, 174 Ill.Dec. 259, 598 N.E.2d 456. In evaluating the mother's progress, the court stated:
"[T]he situation that triggered the removal of S.J. was the birth of the child with cocaine in her systemor arguably the mother's use of cocaine and other mood-altering drugs. We know little else about the relevant conditions at the time of the neglect adjudication. Other than the facts that S.J. was born with cocaine in her system, that [the mother] had had a previous `cocaine baby,' and that [the mother] admittedly used cocaine for some time prior to the neglect adjudication, there is little record evidence of the general conditions surrounding the initial neglect adjudication." S.J., 233 Ill.App.3d at 121-22, 174 Ill.Dec. 259, 598 N.E.2d 456.
In so stating, the court reiterated its previous conclusion that the mother had made substantial progress in dealing with her drug addiction, albeit not strictly in the manner contemplated by the DCFS's service plans. See S.J., 233 Ill.App.3d at 120, 174 Ill.Dec. 259, 598 N.E.2d 456. Contrary to the fourth district's assertion, there was no evidence of any dangerous condition that had not been remedied.
This court followed S.J. in In re A.J., 296 Ill.App.3d 903, 231 Ill.Dec. 34, 695 N.E.2d 551 (1998). There, too, the minor was born with cocaine in her system. In assessing the respondent father's reasonable progress, the court noted that "evidence of the precise conditions at the time of the neglect adjudication is not essential to the determination of whether a parent has made reasonable progress." (Emphasis added.) A.J., 296 Ill.App.3d at 913, 231 *403 Ill.Dec. 34, 695 N.E.2d 551. The court further stated:
"Nevertheless, even in this context, DCFS service plans ought to be directed to the parental deficiencies that led to the removal of the child. [Citation.]
By definition, progress requires movement from some point to some other point. In other words, there must be a yardstick by which progress can be measured. While the yardstick need not necessarily be the condition which caused the child's removal in the first place, it must, as we held in S.J., bear some relationship to a parental shortcoming that would inhibit the return of the child to the parent. [Citation.]" A.J., 296 Ill.App.3d at 913-14, 231 Ill. Dec. 34, 695 N.E.2d 551, citing S.J., 233 Ill.App.3d at 120, 174 Ill.Dec. 259, 598 N.E.2d 456.
The father in A.J. had completed a substance abuse evaluation, taken parenting classes, attended visitations regularly, and provided verification of housing and income. However, the trial court terminated his parental rights because he failed to attend outpatient drug treatment and Al-Anon sessions. The only basis for the former requirement was unsubstantiated hearsay that respondent had failed two or three drug tests; the only basis for the latter was unsubstantiated hearsay that he continued to have a relationship with the minor's mother (an admitted drug user). Respondent denied both these allegations. This court reversed the trial court's judgment, stating:
"The State utterly failed to establishat least by competent evidencethat respondent had a drug problem that hindered his ability to raise his child or that he was having a destructive relationship with the child's mother that required him to undergo counseling. The only reason for terminating respondent's parental rights was his failure to comply with administrative directives that had nothing to do with his ability as a parent." A.J., 296 Ill.App.3d at 916, 231 Ill.Dec. 34, 695 N.E.2d 551.
The Appellate Court, Fifth District, recently reached a similar conclusion in a case with comparable facts. The court held that the circuit court erred in terminating the parental rights of a mother who violated her service plan by maintaining a relationship with a man when there was no evidence that the latter abused drugs or alcohol, broke any laws, or abused the minor or other children during the relevant period. In re M.F., 304 Ill.App.3d 236, 242, 237 Ill.Dec. 889, 710 N.E.2d 519 (1999).
The concern of S.J., A.J., and M.F. is that the focus of a case remain on the respondents' abilities as parents relative to the needs of the children. The problem with the fourth district's approach, which focuses almost solely on whether the respondent complied with the tasks outlined in the service plans (see C.S., 294 Ill. App.3d at 788-89, 229 Ill.Dec. 225, 691 N.E.2d 161; In re L.L.S., 218 Ill.App.3d 444, 463-64, 160 Ill.Dec. 804, 577 N.E.2d 1375 (1991)), is that tasks in service plans may become ends in themselves. There is a natural tendency, once a case comes into the system, for the caseworker to prescribe services to address many different problems, those real and potential. These prescriptions are undoubtedly well-intentioned and quite likely provide some residual benefits to the parents and children. The problem is that caseworkers acquire inordinate control over the parents' lives and may be tempted to prescribe services based on personal preferences rather than the child's needs. Requiring unnecessary services taxes the already overburdened resources of the agencies providing the services and risks focusing the parents' attention away from correcting serious deficiencies and onto the routine of jumping through administrative hoops. For example, a caseworker might order a respondent father to attend music appreciation classes because he sincerely believes that music will improve the quality of the *404 child's environment. However desirable the goal, the child simply will not be harmed (except in a vague, intangible way) if the parent's musical endeavors come up short. Even L.L.S. recognized that service plan tasks "should be designed to remediate parental deficiencies that, if not remediated, will prevent the child from being returned to the parent's custody." L.L.S., 218 Ill.App.3d at 463, 160 Ill.Dec. 804, 577 N.E.2d 1375, quoted in C.S., 294 Ill.App.3d at 788, 229 Ill.Dec. 225, 691 N.E.2d 161.
Finally, we note that C.S. refers to section 8.2 of the Abused and Neglected Child Reporting Act, which sets forth requirements for drafting service plans and provides:
"No service plan shall compel any child or parent to engage in any activity or refrain from any activity which is not reasonably related to remedying a condition or conditions that gave rise or which could give rise to any finding of child abuse or neglect." 325 ILCS 5/8.2 (West 1998).
The service plans in S.J., A.J., and M.F. did exactly what the statute prohibits. However, the fourth district's approach, while paying lip service to this statutory requirement, allows parental rights to be terminated on the basis of any failure to comply with a service plan, regardless of whether the task is reasonably related to some parental shortcoming. We cannot accept this proposition and continue to adhere to S.J. and A.J.

III. Evidence of Lack of Reasonable Progress
In light of this discussion, we return to the facts of the present case. As noted, the trial court found that respondent failed to make reasonable progress toward the return of the minor. Because the termination of parental rights is an extraordinarily serious matter, the State must prove unfitness by clear and convincing evidence. S.J., 233 Ill.App.3d at 113, 174 Ill.Dec. 259, 598 N.E.2d 456. A trial court's finding of unfitness will not be reversed on appeal unless it is against the manifest weight of the evidence. In re V.O., 284 Ill.App.3d 686, 690, 220 Ill.Dec. 527, 673 N.E.2d 439 (1996). "Reasonable progress" is an objective judgment and requires demonstrable movement toward the goal of reunification. A.J., 296 Ill. App.3d at 913, 231 Ill.Dec. 34, 695 N.E.2d 551.
What we have already said answers respondent's contention that reasonable progress must be judged only against the precise condition that was the basis for the removal of the child from parental custody. The basis for DCFS's intervention will often be a single incident, one that happens to be brought to the agency's attention. Subsequent investigation may well reveal other, even more serious conditions. To this extent, we agree with the fourth district. See C.S., 294 Ill.App.3d at 789, 229 Ill.Dec. 225, 691 N.E.2d 161. For this reason, S.J. refers to "conditions" (plural) that existed at the time of the removal. "At the time" of the removal is not limited to the precise moment that the child crosses the threshold of the parents' home. The phrase is certainly broad enough to encompass conditions that come to light later.
Here, respondent's incarceration clearly was a condition that existed at the time of the removal. He admits in the next section of his argument that he was in the county jail at the time of the child's birth. Obviously, he has not made progress in remedying this condition and the trial court could properly rely on his lack of progress. While in some sense respondent's imprisonment is not his "fault," it was his choice to engage in criminal conduct that caused him to be imprisoned. We note also that "reasonable progress" is an objective standard that is not concerned with the parent's individual efforts and abilities.
Other evidence showed that respondent failed to comply with many of *405 the tasks in the service plans. He failed to complete parenting classes, anger management classes, or a psychological assessment although these services were available to him. Unlike in A.J., the appropriateness of these services was apparent. The caseworkers testified that parenting classes were necessary because of respondent's history of incarceration, which gave him little opportunity to learn parenting skills. Anger management and counseling were ordered because of respondent's history of violent crime. Respondent does not argue on appeal that these tasks were not related to actual parental shortcomings. The trial court could properly find respondent an unfit parent on this basis.

IV. Repeated Incarceration as a Basis for Termination
Because of the importance of the issue, we also address respondent's second argument that the State failed to prove his unfitness on the basis of his repeated incarceration. Respondent contends that the statute's plain language refers to "repeated incarceration" and "convictions." He argues that, because he has been serving one continuous term of incarceration since the minor's birth, this section does not apply.
In construing a statute, a court must ascertain and give effect to the legislature's intent in enacting the statute. Collins v. Board of Trustees of Firemen's Annuity & Benefit Fund, 155 Ill.2d 103, 110, 183 Ill.Dec. 6, 610 N.E.2d 1250 (1993). The statutory language is usually the best indication of the drafters' intent, and the language should be given its plain, ordinary, and popularly understood meaning. Collins, 155 Ill.2d at 111, 183 Ill.Dec. 6, 610 N.E.2d 1250. A court should presume that the legislature did not intend to create absurdity, inconvenience, or injustice. Henrich v. Libertyville High School, 186 Ill.2d 381, 394, 238 Ill.Dec. 576, 712 N.E.2d 298 (1998).
Here, the court found respondent unfit under section 1(D)(s), which declares a parent unfit where:
"[T]he parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 1998).
This relatively new provision has not been judicially construed. Respondent contends that because the statute refers to "repeated incarceration" as a result of "criminal convictions" it does not apply to this case, where respondent has been incarcerated only once for a single conviction.
The State responds in two ways. First, nothing in the statute's plain language requires that the convictions have occurred during the minor's lifetime. The State points out that respondent has been incarcerated three times, including twice before the child's birth. As the State contends, these convictions can still affect the ability to be a parent, as by mandating longer sentences for subsequent convictions. Obviously, a party's imprisonment before a child's birth may prevent him from obtaining stable housing and employment and acquiring parenting skills.
The State also argues that respondent's proposed construction leads to absurd results. Under respondent's reading of the statute, someone sentenced to natural life imprisonment could not have his parental rights terminated under this provision while someone who received two one-year sentences separated by a few weeks could lose his rights. We agree that the legislature could not have intended such a result.
The statute's obvious purpose is to assure that a minor will have a stable home within a reasonable time and to provide *406 for termination where a parent's long-term incarceration makes that impossible. It makes no difference to the child whether the parent's imprisonment results from a single conviction or several; the parent is equally unable to provide a stable home environment. Therefore, the court did not err in finding respondent an unfit parent on this basis.
The judgment of the circuit court of Kane County is affirmed.
Affirmed.
INGLIS and GEIGER, JJ., concur.