NOTICE
Decision filed 10/09/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240741-U

NO. 5-24-0741

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* JO O., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-JA-27 |
| | ) | |
| Melinda O., | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's fitness determination was against the manifest weight of the evidence.

¶ 2    The respondent, Melinda O. (Mother), appeals from the circuit court's June 4, 2024, decision to terminate her parental rights. For the reasons set forth below, we reverse.

¶ 3                                I. BACKGROUND

¶ 4    Mother is the biological mother of Jo O. (J.O.), born on February 1, 2023. J.O.'s father surrendered his rights and is not a party to this appeal. J.O. was taken into protective custody soon after birth due to Mother testing positive for cannabinoids and Mother's past history of abusing methamphetamines. J.O. did not present with any withdrawal symptoms.

1

¶ 5    The State filed a juvenile petition for J.O. pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) based on neglect due to an injurious environment. The petition filed for J.O. alleged that Mother was a party to a previous juvenile case;[1] Mother had a prior history with the Department of Children and Family Services (DCFS) where she was indicated for environmental neglect and substance misuse; and Mother tested positive for amphetamines on July 17, 2022.

¶ 6    On April 4, 2023, the circuit court entered an adjudicatory order finding that J.O. was neglected in that she was in an environment that was injurious to her welfare as defined by section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2022)). The dispositional hearing was held immediately after the entry of the order of adjudication. The circuit court found that Mother was unfit to care for J.O., the proposed service plan was appropriate, and the permanency goal of J.O. returning home within 12 months was appropriate. J.O. was made a ward of the court and the Guardianship Administrator of DCFS was granted custody with the right to place J.O. Mother was granted supervised visitation monitored by DCFS.

¶ 7    Mother's service plan required her to complete an integrated assessment, complete substance abuse treatment, comply with drug screens, complete a mental health assessment and to comply with recommended treatment, participate in a parenting education program, complete a domestic violence assessment and recommended services, maintain suitable housing, and refrain from engaging in illegal activity.

¶ 8    Mother completed a mental health assessment as requested and was not referred for mental health services because it was believed that Mother's behavior was due to drug use. After Mother began substance abuse counseling, her counselor recommended that Mother receive a new mental

---

[1]Mother had two biological sons who are not parties in this case.

health evaluation and a psychological assessment. DCFS scheduled a psychological evaluation of Mother in November of 2023.

¶ 9 Nikki Hernandez, PhD conducted a psychological evaluation of Mother on November 10, 2023, and subsequently issued a written report. Dr. Hernandez received background information from DCFS and Mother that Mother had stopped abusing methamphetamines but continued to express paranoia.

¶ 10 Dr. Hernandez's report included behavioral observations. Mother "remained emotionally regulated during cognitive testing and remained consistent throughout the evaluation" and there was "no indication of psychotic processes observed or reported." Mother was "open and honest" although she appeared defensive when she was self-reporting.

¶ 11 Dr. Hernandez reported that Mother had an average cognitive ability while her verbal comprehension index score was in the low average range. Dr. Hernandez also reported that Mother's "tendency to minimize the gravity of her involvement with DCFS is likely a consequence of shame and/or guilt rather than an intellectual or emotional disorder." Additionally, Mother "did not present with clinically significant symptoms consistent with a mental health diagnosis that would impede on her ability to parent her children." While Dr. Hernandez observed some problematic personality traits, Mother did not present with evidence of a personality disorder. Mother was hostile at times, struggled with criticism, and would hide her weaknesses. Dr. Hernandez reported that these personality traits "can act as a treatment barrier to establishing a therapeutic alliance and likely explain her failure to maximize the counseling made available." However, Mother had the "potential to make positive changes in her personality style" if she is able to "drop her defenses and hear constructive feedback."

¶ 12    Dr. Hernandez recommended that Mother remain abstinent from methamphetamine, reduce or eliminate her marijuana consumption, participate in Narcotics Anonymous (NA), and comply with substance abuse screenings. Mental health counseling was also recommended. The report did not address whether prescription medications for mental health issues were recommended for Mother. Mother's service plan was updated to include that the psychological evaluation recommended that Mother "reduce or eliminate" marijuana consumption.

¶ 13    On April 10, 2024, the State filed a petition for termination of parental rights. The State alleged that Mother was unfit as defined by the Illinois Adoption Act (750 ILCS 50/1(D)(b), (m)(i), (m)(ii) (West 2022)) where Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of J.O.; Mother failed to make reasonable efforts to correct the conditions that were the basis for removal of the child; and Mother failed to make reasonable progress towards the return of the child during a nine-month period after adjudication of neglect. The State alleged that the "nine month period" was from "April 4, 2023, through the date of the filing of this petition," which was a 12-month period.

¶ 14    A month after the petition to terminate parental rights was filed, Mother's caseworker, Paige Stamps, drafted and filed a best interest report, dated May 7, 2024. The report summarized Mother's compliance with her service plan within the last six months, since November of 2023.

¶ 15    Mother was rated unsatisfactory with her substance abuse treatment requirements. Mother was enrolled in a dual substance abuse/mental health plan. The report included a notation that on April 4, 2024, Mother had a positive test result for methamphetamines in a hair follicle and alcohol in a urine sample. On April 18, 2024, Mother tested positive for THC. Mother had denied that she relapsed. Stamps reported that she had called the testing lab to verify that the positive drug test was not caused by Mother's prescribed medications. Stamps did not receive a return phone call on

4

her false positive inquiry. Mother additionally had reported that she intended to start NA. The caseworker also noted that Mother had sent her multiple incoherent and delusional text messages.

¶ 16    Mother was rated unsatisfactory with her mental health requirements. After Mother's psychological evaluation, she was referred to one-on-one mental health therapy. The counselor reported Mother was more engaged in counseling since February of 2024. Mother was making progress and able to identify coping skills. However, Mother was unsatisfactory for not yet implementing those skills by May of 2024. Mother did not want to take medication for her mental health.

¶ 17    Mother was rated unsatisfactory for domestic violence services requirements. The report stated that Mother "continues to place blame on others for the abuse in her past relationship. [Mother's] counselor reported that [Mother] would get back together with her abuser if 'they were on good terms.'" Mother's domestic violence counselor informed Mother's caseworker that Mother denied the impact that domestic violence has had on her family. Mother was also involved in an anger management program and her counselor reported that Mother admitted to prior abusive relationships. Mother did not admit that her partner was abusive, but Mother acknowledged that her children were affected by their relationship.

¶ 18    Mother was rated unsatisfactory in regard to parenting education because Mother was not using physical/occupational therapy skills to assist J.O. crawl. Mother would also show J.O. videos on her phone during visitation.

¶ 19    The report also included that Mother had completed the "Flourish Program," a parenting program through Centerstone. Mother was attentive during visitation and attended every visit offered. Mother was also rated satisfactory for her housing requirement and Mother refrained from illegal activity.

5

¶ 20    The entire best interest portion of the May 7, 2024, report stated:

"[J.O.] has been in currently [*sic*] placement since leaving the hospital at birth at two days old. She is extremely bonded and has an emotional attachment to the caregivers and their family. The caregivers started [J.O.] in early intervention services when they identified a need and have taken her to every doctor's appointment necessary. Since [J.O.] has started talking, she refers to the caregivers as 'mama' and 'dada.' The caregivers have established a relationship with [J.O.'s] brother \*\*\* and his adoptive caregivers in order to maintain the sibling relationship between the youth."

¶ 21    The circuit court held a fitness hearing on June 4, 2024. Mother's caseworker, Stamps, was the only witness for the State. Stamps testified that she worked as a foster care caseworker with Brightpoint, and she had been assigned to Mother for the duration of this case. Stamps had created Mother's service plan, assisted with visitation, and tested whether the child would be safe in the home. Every six months, Stamps reviewed the service plan with Mother, and the last review occurred on February 14, 2024. According to Stamps, Mother did not make substantial progress on her service plan. Stamps did not specify a nine-month period when she testified.

¶ 22    Stamps testified that she had referred Mother to a substance abuse treatment assessment, and Mother was subsequently referred to an outpatient substance abuse treatment program. Mother attended the treatment program. Mother was compliant with attending drug screens and had positive tests for THC and alcohol. Stamps was concerned that Mother was drinking to the point of intoxication and tested positive for THC. Mother's psychological evaluation recommended that she reduce or eliminate her THC use. Mother additionally tested positive for methamphetamine on a hair follicle test administered on April 4, 2024.

¶ 23    Stamps testified that Mother was unsatisfactory with her mental health counseling requirement because she was not "open and honest" about why the case was opened or her past experiences with mental health. According to Stamps, Mother was not making progress in her

6

sessions. Stamps testified that Mother was unwilling to take medication and there was no psychiatrist who would "take somebody who's not willing to get on medication."

¶ 24    Mother completed her parenting program through Centerstone. Mother had supervised visitation with J.O. every Thursday for two hours. Mother would attend regularly and would engage with J.O. Mother was, however, rated unsatisfactory with her parenting requirement because she was not using the correct developmental toys during visitation and had stated that she wanted to buy J.O. a phone or tablet for her first birthday. Stamps additionally testified that J.O. received occupational and physical therapy. Mother did not implement the strategies recommended by J.O.'s occupational or physical therapist during visitation.[2]

¶ 25    Mother was referred to domestic violence counseling and Mother attended her counseling sessions. She was rated unsatisfactory for her domestic violence requirement because her counselor had "concerns of her understanding the impact that domestic violence has had on her children and her family" where Mother reported that she was willing to resume a relationship with her abuser. Mother was also required to attend anger management classes as a component of her domestic violence service requirement. Mother was compliant with this requirement. Mother had adequate housing, and Mother had refrained from illegal activity. Overall, Mother was cooperative, would attend services, and had made an effort. Stamps testified that Mother had not made progress.

¶ 26    During cross-examination, Stamps testified that Mother had attended everything that was asked of her. Stamps would speak to Mother at least twice monthly and sometimes on a weekly basis. Stamps testified that Mother's mental health counselor reported that Mother has made a

---

[2]Notably, DCFS would not allow Mother to attend any medical visits involving J.O.

"small amount" of progress. Mother only had one positive drug test for anything other than alcohol and THC, which were legal substances. Mother never appeared intoxicated during visitation.

¶ 27    On cross-examination Stamps additionally testified that Mother was not making progress with her domestic violence requirements. Even though Mother attended her classes, Mother did not understand the material. Specifically, Mother did not understand "the impact that domestic violence has had on her children previously and she's not able to take information from session to session." Mother had not been involved in an incident of domestic violence while J.O. has been in care.

¶ 28    Stamps additionally testified that it was unreasonable for someone struggling with domestic violence, substance abuse, and mental health issues to make progress within a year. Overall, Mother's progress had slightly improved during the last two months. Stamps further testified that Mother had not made enough progress to demonstrate that she was able to safely care for J.O.

¶ 29    After Stamps's testimony concluded, Mother testified on her own behalf. Mother testified that she was making progress with mental health counseling. Mother explained that she did not want to rely on medications and was working on her willpower and self-confidence during her counseling sessions. She attended sessions weekly and believed they were helpful. Mother had also attended a weekly domestic violence course since August of 2023. Mother testified that she had learned coping skills. She also worked with her counselor on parenting skills and identifying "red flags when it comes to abuse." Mother testified that a child should never be around domestic violence.

¶ 30    Mother additionally testified that she was aware of J.O.'s medical needs and that she had discovered that J.O. had an issue with turning her head during visitation. Mother told Stamps about

J.O.'s issue and J.O. started physical therapy thereafter. Mother had a support system that she could rely on if she needed help. Mother denied any recent methamphetamine use and testified that she no longer associated with people that used drugs. Mother additionally testified that she was on prescription medication that she believed caused a false positive on her drug test. She would purchase THC from a dispensary or share with a friend who would purchase THC from a dispensary. Mother denied excessive drinking to the point of intoxication. Mother explained that she had sent incoherent text messages because she does not use punctuation and sometimes used the "talk-to-text" function.

¶ 31    After Mother's testimony concluded, Stamps testified that Mother tested positive for methamphetamines in April of 2024. When Mother was informed of the positive test, she had denied using methamphetamines and suggested the test was a false positive. Stamps then contacted "the lab" after Mother denied using methamphetamines. Stamps testified that she could not remember who she spoke to but was told that Mother's medication would not have resulted in a false positive test. Stamps testified that she did not receive anything in writing from the lab related to her conversation. The hair follicle drug test results were not submitted into evidence.

¶ 32    After closing arguments by the State and Mother's counsel, the circuit court found that the State had not met its burden regarding allegations that Mother failed to make reasonable efforts or the allegation that Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of J.O. The circuit court addressed Mother and stated:

> "[Y]ou've been checking off the boxes, but you haven't been making progress. One of the most concerning things is the positive meth hair follicle from April 12th,[3] but also that the counselors are saying that you're making minimal progress. You should be further along than you are right now."

---

[3]The record does not include evidence of an April 12 drug test. The caseworker testified to an April 4, 2024, drug test.

The circuit court found that the State had proven by clear and convincing evidence that Mother was unfit because she failed to make reasonable progress.

¶ 33 Immediately after the fitness hearing concluded, the circuit court held the best interest hearing. Stamps testified for the State. J.O. had been placed in a traditional foster home since February 3, 2023, and was attached to her foster family. Her foster father is employed "in the medical field" and her foster mother is a stay-at-home mother. The foster parents were willing to adopt J.O.

¶ 34 Stamps testified that J.O. was not crawling properly and needed physical therapy and occupational therapy. J.O.'s foster parents were willing to take her to doctor appointments. Stamps additionally testified that J.O. had siblings and her foster parents encouraged sibling relationships, but J.O. had stopped seeing her siblings. Stamps testified that it was in J.O.'s best interest to stay with her foster parents. The May 7, 2024, best interest report drafted by Stamps was admitted into evidence.

¶ 35 On cross-examination of Stamps, she testified that she observed Mother with J.O. during visitation. Stamps testified that "[J.O.] interacts with [Mother] during the visits. The visits go okay." Mother demonstrated love towards J.O. Mother would "do the best that she was able to" with J.O.

¶ 36 Mother testified that she visited with J.O. for two hours a week. She had bonded with her daughter and J.O. called her "mom." Mother did not have a relationship with the foster family. The foster family would not allow Mother to attend medical appointments or be involved in any decisions regarding J.O.'s care. Mother additionally testified that DCFS did not allow Mother to participate in care for J.O. outside of her weekly two-hour visits.

10

¶ 37 Terry O'Leary, the guardian *ad litem* (GAL), provided an oral recommendation to the circuit court. He did not submit a written report. The GAL stated that he was "deeply troubled by this case." He questioned the decision of whether Mother had not made reasonable progress. The GAL additionally believed that it was wrong that Mother was not allowed to attend J.O.'s medical appointments. The GAL recommended that the circuit court refrain from terminating Mother's parental rights.

¶ 38 Mother's attorney argued that Mother had not been given an adequate opportunity to parent J.O., who was only 14 months old. Mother had been trying to have J.O. returned to her care.

¶ 39 The State argued that Mother was provided with adequate time and if she had made reasonable progress, then her visitation time would have increased. J.O. was in a stable placement with her foster family and it was in J.O.'s best interest for Mother's parental rights to terminate.

¶ 40 The circuit court found that Mother loved J.O. but J.O.'s best interests were at issue. The circuit court conceded this was a close case. The circuit court also realized that it was required to consider the best interest factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). The circuit court only identified J.O.'s need for permanency as the reason for its best interest determination. The circuit court found that the State had proven by a preponderance of the evidence that it was in J.O.'s best interest to terminate Mother's parental rights and that DCFS receive the power to consent to adoption.

¶ 41 The circuit court entered a formal written order terminating Mother's parental rights on June 3, 2024. This appeal followed.

¶ 42                                                    II. ANALYSIS

¶ 43 On appeal, Mother argues that the State failed to prove by clear and convincing evidence that Mother failed to make reasonable progress towards the return of J.O. during the nine-month

11

period following adjudication. Mother additionally argues that the State failed to show by a preponderance of the evidence that it was in J.O.'s best interest to terminate Mother's parental rights. Thus, the circuit court's decision to terminate Mother's parental rights was against the manifest weight of the evidence.

¶ 44 "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28. Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2022). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). Because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). If the circuit court finds a parent to be unfit, then the cause proceeds to a determination of whether it is in the best interest of the child for the parent's rights to be terminated. 750 ILCS 50/1(D) (West 2022); *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000).

¶ 45 Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). The circuit court's factual findings will not be reversed unless they are against the manifest weight of the evidence. *In re M.J.*, 314 Ill. App. 3d at 655.

12

¶ 46    In this case, the circuit court found that Mother was unfit for not making reasonable progress during the relevant nine-month period to return the child to the parent. See 750 ILCS 50/1(D)(m)(ii) (West 2022). The child came into care because there was a previous finding of unfitness at a dispositional hearing for another minor, Mother had a prior history with DCFS, Mother tested positive for amphetamines in July of 2022, and had a prior history of substance abuse. A service plan was provided to Mother to correct the conditions that brought J.O. into care and required Mother to complete mental health, substance abuse, parenting, and domestic violence services, and Mother was required to obtain housing and refrain from any illegal activity.

¶ 47    "Reasonable progress" is an objective standard with the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). The reasonable progress objective focuses on " 'the amount of progress toward the goal of reunification one can reasonably expect from the parent under the circumstances' " and the specific circumstances of the case must be considered. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 57 (quoting *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000)). Progress is measured by the parent's compliance with the court's directives, services plans, or both and requires the parent to make measurable or demonstrable movement toward the reunification goal in the near future. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). A parent is not required to complete all required tasks or services during the relevant nine-month period to demonstrate reasonable progress. *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 48    Section 1(D)(m)(ii) provides that "[i]f a service plan has been established *** and if those services were available, then, for purposes of the Act, 'failure to make reasonable progress ***' includes the parent's failure to substantially fulfill his or her obligations under the service plan." 750 ILCS 50/1(D)(m)(ii) (West 2022). "Per the express words of the statute, a parent's fulfillment

13

is contingent on the availability of services, and the issue is whether she substantially fulfilled her obligations under the plan." *In re D.D.*, 2022 IL App (1st) 220410, ¶ 89.

¶ 49 When determining whether Mother has made reasonable progress towards the return of J.O., the circuit court only considers the evidence occurring during the relevant nine-month period. *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 68. Section 1(D)(m) requires the State to file a pleading that specifies the nine-month period or periods it relied on in its petition to terminate parental rights. 750 ILCS 50/1(D)(m)(ii) (West 2022). The State's petition to terminate Mother's parental rights alleged the nine-month period of April 4, 2023, through the date of the filing of this petition. The petition was filed on April 10, 2024. The State alleged a period of over a year.

¶ 50 A State's error in specifying an actual nine-month period is a pleading defect and does not equate to a failure to state a cause of action. *In re S.L.*, 2014 IL 115424, ¶ 21. Section 2-612(c) of the Code of Civil Procedure states that "[a]ll defects in pleadings, either in form or substance, not objected to in the trial court are waived." 735 ILCS 5/2-612(c) (West 2022). Mother did not object to the State's motion to amend or to the calculation of the nine-month time period before the circuit court and the parties proceeded at trial as if all possible nine-month periods were relevant.

¶ 51 We note that the caseworker's written best interest report, dated May 7, 2024, only summarized six months of Mother's compliance with her service plan. DCFS had not initially referred Mother for mental health treatment because Mother's mental health issues were overshadowed by substance abuse treatment recommendations. Several months after the date of adjudication, Mother's substance abuse counselor recommended a psychological evaluation. Mother was referred to mental health treatment based on the recommendations of the psychological evaluation, approximately eight months after adjudication. Counseling for Mother's

14

mental health issues and substance abuse issues are connected, and she was not referred to treatment to allow her to make progress until the end of the nine-month period after adjudication.

¶ 52 According to Mother's psychological evaluation, Mother had the "potential to make positive changes in her personality style" if she was able to "drop her defenses and hear constructive feedback." In February of 2024, after Mother began receiving one-on-one counseling, Mother's caseworker reported that Mother was making progress with her mental health issues and was able to identify coping skills. Mother was engaged in counseling. Mother, however, was rated unsatisfactory with her mental health requirements in May of 2024, because she had not yet demonstrated that she was implementing those skills.

¶ 53 Additionally, although Mother had completed her parenting program, she was found unsatisfactory with parenting requirements because she was not implementing the strategies recommended by J.O.'s occupational or physical therapist during visitation. However, as the GAL noted, Mother was not allowed to participate in occupational or physical therapy appointments. Mother's ability to demonstrate reasonable progress is contingent on the availability of services, and those services were not available to her.

¶ 54 The caseworker also testified that Mother was unsatisfactory for her domestic violence requirements based on information received that Mother would return to an abusive relationship. Mother testified that she had been participating in a domestic violence course since August of 2023, and attended weekly sessions. Mother was working with her counselor on identifying "red flags when it comes to abuse." Mother additionally testified that a child should never be around domestic violence. The written best interest report indicated that Mother had told her anger management counselor that she had been involved in a prior abusive relationship and that Mother

15

acknowledged that her children were affected by her prior relationship. There were no reports that Mother was involved in any domestic violence incidents while J.O. was in care.

¶ 55　Mother's caseworker reported that Mother was cooperative and would attend services, visitation, and she had made reasonable efforts to correct the conditions that were the basis for removal of J.O. Mother also had adequate housing, and she refrained from illegal activity. The caseworker additionally testified that it was unreasonable for someone struggling with domestic violence, substance abuse, and mental health issues to make progress within a year.

¶ 56　Ultimately, the reasonable progress standard does not require that Mother complete all services within nine months. The State did not prove by clear and convincing evidence that Mother was unfit based on Mother's specific circumstances where she was referred for individual mental health therapy at the end of the nine-month period after adjudication and was not allowed to participate in occupational and physical therapy sessions to learn how to address J.O.'s needs. We find that the State failed to meet it burden and the circuit court erred in finding that Mother failed to make reasonable progress and was unfit as a parent. Upon return of this matter to the circuit court, we anticipate that DCFS will reengage with Mother and provide all necessary services for Mother to continue making progress toward the return of J.O.

¶ 57　In light of the foregoing, we do not need to address the issue of the circuit court's best interest determination.

¶ 58　　　　　　　　　　　　　III. CONCLUSION

¶ 59　The judgment of the circuit court of Madison County terminating Mother's parental rights is reversed.

¶ 60　Reversed.

16